UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

LYNDA G. DODD,

                      Plaintiff,

-v-

THE CITY UNIVERSITY OF NEW YORK,
VINCENT BOUDREAU, BRUCE CRONIN,
PAUL OCCHIOGROSSO, MARY ERINA
DRISCOLL, KEVIN FOSTER, JOHN
KRINSKY, RAJAN MENON, AND VIVIEN
TARTTER,

                      Defendants.

------------------------------------------------------------------X

17 Civ. 9932 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/7/2018

PAUL A. ENGELMAYER, District Judge:

Plaintiff Lynda Dodd brings this lawsuit against her employer, the City University of New York ("CUNY"), alleging retaliation for her opposition to unlawful employment practices in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794(d) (the "Rehabilitation Act"). Dodd further alleges that defendants Vincent Boudreau, Bruce Cronin, Paul Occhiogrosso, Mary Erina Driscoll, Kevin Foster, John Krinsky, Rajan Menon, and Vivien Tartter, in their individual capacities (the "individual defendants," and together with CUNY, "defendants"), aided and abetted CUNY's retaliation against her, in violation of the New York State Human Rights Law, New York Executive Law § 290 *et seq.* (the "HRL"), and the New York City Human Rights Law, New York City Administrative Code § 8-101 *et seq.* (the "NYCHRL").

Pending now is defendants' motion to dismiss. Defendants first argue that the Rehabilitation Act claim against CUNY is not cognizable because most of the alleged retaliatory acts are not sufficiently adverse to give rise to a retaliation claim, and those few acts that are

sufficiently adverse are not causally connected to Dodd's protected activity. Defendants also move to dismiss all claims against the individual defendants on the grounds that (1) with the exception Boudreau, they cannot be liable under the HRL as aiders and abettors; and (2) the alleged acts are not sufficiently adverse to support Dodd's claims.

In addition, Dodd cross-moves for leave to further amend her complaint to (1) add information relating to her existing claims; (2) assert diversity jurisdiction pursuant to 28 U.S.C. § 1332 as an additional basis for the Court's jurisdiction; (3) allege new instances of retaliation by defendants; and (4) add an allegation of discrimination against Boudreau in his official capacity, in violation of the Americans with Disabilities Act, 42 U.S.C. § 1201, *et seq.* (the "ADA").

For the reasons that follow, defendants' motion to dismiss is denied. Dodd's motion for leave to amend is granted in part and denied in part.

## I. Background[1]

### A. The Parties

Dodd was hired by the City College of New York ("CCNY") to be the Joseph H. Flom Professor of Legal Studies ("Flom Professor"). Am. Compl. ¶¶ 1, 10, 21. Shortly after Dodd assumed the position of Flom Professor, she was diagnosed with multiple sclerosis ("MS"). As discussed further below, Dodd alleges that after she alerted CCNY to her diagnosis, her requests

---

[1] The facts related herein are drawn from the Amended Complaint, Dkt. 17 ("Am. Compl."). For the purpose of resolving the motion to dismiss, the Court assumes all facts pleaded in the Amended Complaint to be true, and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). In resolving this motion, the Court also considered defendants' memorandum of law in support of their motion to dismiss ("Def. Br.") (Dkt. 23); Dodd's memorandum of law in opposition to that motion ("Pl. Br.") (Dkt. 24); and defendants' reply memorandum ("Def. Reply Br.") (Dkt. 25).

for reasonable accommodations were denied, she experienced discrimination, and her supervisors retaliated against her.

CUNY is a publicly funded university headquartered in Manhattan. *Id.* ¶ 10. CCNY is a senior college within CUNY. *Id.*

The individual defendants are each employees of CCNY. *Id.* ¶¶ 11–18. Boudreau is CCNY's current President and was interim President between November 2016 and December 2017. *Id.* ¶ 11. From 2014 to 2016, he served as Dean of the Colin Powell School of Civic and Global Leadership at CCNY (the "Powell School"). *Id.* Before becoming Dean of the Powell School, Boudreau was a political science professor who was chair of the hiring committee for the Flom Professor position. *Id.* ¶ 21. Krinsky is a political science professor at CCNY and served as chair of the political science department between 2010 and 2012. *Id.* ¶ 16. Dodd reported directly to Krinsky. *Id.* ¶ 23. Cronin is also a political science professor at CCNY and succeeded Krinsky as chair of the department in 2012. *Id.* ¶ 12. Occhiogrosso is Executive Counsel to the President of CCNY. *Id.* ¶ 13. Foster assumed the role of Dean of the Powell School in November 2016. *Id.* ¶ 15. Menon is a CCNY political science professor. *Id.* ¶ 17. Tartter is a CCNY psychology professor. *Id.* ¶ 18. Driscoll served as CCNY interim provost between August 2016 and March 2018. *Id.* ¶ 14.

### B. Dodd's Employment at CCNY

In June 2009, CCNY began a search for a candidate to serve as the Flom Professor, a tenure-track, associate professor position funded by the law firm Skadden, Arps, Slate, Meagher & Flom ("Skadden Arps"). *Id.* ¶¶ 1, 19, 22.

In September 2009, Boudreau, then-chair of the Flom hiring committee, wrote a memorandum recommending Dodd for the position because of her "extraordinary

3

qualifications," which included a J.D. from Yale Law School, a PhD in Politics from Princeton University, and five years of experience as a law professor at American University. *Id.* ¶¶ 20, 21. Boudreau wrote that Dodd "far exceeded all other candidates in terms of her qualifications and experience" and that "in every respect—her interview, her presentation and her vision for the Program—Lynda Dodd was head and shoulders above the rest of the candidates." *Id.*

In January 2010, Dodd was hired for the position. *Id.* ¶ 19. She was provided a supplemental salary equal to one-third of her base salary, as well as a lighter teaching course load as compared with other non-tenure faculty members. *Id.* ¶ 22. Dodd avers that since she began teaching in 2010, her courses received positive reviews by students and faculty. *Id.* ¶ 24.

As a tenure-track faculty member, Dodd was subject to an annual reappointment process. This process, which is governed by CUNY's bylaws, includes four levels of review: by the academic department's executive committee; the personnel and budget committee for the school or division within CCNY; a college-wide review committee ("Review Committee"); and the college's President. *Id.* ¶¶ 33–35. An adverse decision may be appealed up to the President. *Id.* ¶ 33. A tenure-track professor is considered for reappointment with tenure after six years. Based on this schedule, Dodd originally would have been eligible for tenure in fall 2017. *Id.* ¶ 34.

In spring 2010, shortly after being hired, Dodd was diagnosed with MS. *Id.* ¶ 25. In June 2010, Dodd informed Krinsky, a political science professor and her direct supervisor, of her illness. *Id.* ¶ 26. At this time, her symptoms included facial spasms and difficulty climbing stairs. *Id.* ¶ 25. Over the following several years, her symptoms worsened. *Id.* ¶¶ 27–31.

In June 2011—approximately one year after Dodd alerted Krinsky to Dodd's illness—Krinsky gave Dodd a memo stating that the political science department's executive committee had conducted, and would conduct in the future, a separate "annual review" process for Dodd's

4

title and benefits as a Flom Professor. *Id.* ¶ 39. Dodd had never been told of any separate review process for the Flom Professorship; she states that no such review was conducted in her first year. *Id.* In April 2012, Krinsky informed Dodd that the executive committee expected that Dodd would be "ready to come up for tenure early," before September 2017. *Id.* ¶ 40. Shortly thereafter, Dodd contacted Occhiogrosso, Executive Counsel to the President of CCNY, to ask about the separate evaluation process. Occhiogrosso admitted that no written policy authorized such a process. *Id.* ¶ 41.

In March 2013, Cronin, then-chair of the political science department, sent Dodd a letter stating the executive committee would give her one year to complete a book manuscript. *Id.* ¶ 42. If she did not, the letter stated, the committee would deem it a failure to meet the Flom Professorship's "high standard" for research production. *Id.*

### B. Requests for Accommodation and the Resulting Settlement

On May 23, 2013, Dodd met with then-Provost Maurizio Trevisan and showed Trevisan her medical records, identified herself as an employee with a disability, and requested an accommodation to address "the difficulties with her MS that were affecting the speed of her research production." *Id.* ¶ 43. Dodd also raised concerns about Cronin's March 2013 letter. *Id.* In May 2013, Dodd asked HR personnel to clarify her "essential duties" as a Flom Professor. *Id.* ¶ 43. In October 2013, HR responded by advising Dodd that her "essential—and only—duties relating to the Flom title and benefits were those outlined in her 2009 supplemental offer letter." *Id.* ¶ 45. That 2009 letter stated that the Flom Professor was responsible for "serving as the academic leader developing the honors program, creating the academic curriculum, teaching the honors seminars, advising students, and working with the Skadden, Arps law firm to promote the reputation of the honors program." *Id.* ¶ 22.

In February 2014, as Dodd continued to pursue her accommodation request, Menon, a political science professor, asked Dodd to agree to a shorter research production schedule than was allowed under Dodd's tenure schedule. *Id.* ¶ 47. Dodd informed Menon that she wished to remain on the regular tenure clock and pursue her accommodation request. According to Dodd, Menon "reacted with hostility." *Id.*

On March 27, 2014, HR denied Dodd's accommodation request. *Id.* ¶ 50. No alternative accommodation was proposed. *Id.* Dodd appealed the denial to Michele Baptiste, CCNY's Dean of Diversity, Compliance, and Faculty Relations. *Id.*

Two months later, in May 2014, Dodd was informed that the Review Committee had voted against reappointing her as a Flom Professor for the upcoming 2014–15 academic year. *Id.* ¶ 49. Dodd asserts that Boudreau would have been responsible for presenting her record to the Review Committee, and that he and Cronin had withheld materials favorable to Dodd from the committee. *Id.* Dodd appealed her non-reappointment to then-President Lisa Coico. *Id.* ¶ 51.

On July 9, 2014, Coico granted Dodd's appeal and renewed her title and benefits as a Flom Professor for the 2014–15 year. *Id.* ¶ 52.

On September 16, 2014, Cronin informed Dodd that the political science department's executive committee voted against reappointing her as a tenure-track professor for the 2015–16 academic year. *Id.* ¶ 54. That same month, Dodd communicated with Baptiste about the department's vote and her need for an accommodation. *Id.* ¶ 55.

In November 2014, Baptiste informed Dodd that Boudreau and Cronin opposed the requested accommodations on the ground that Dodd had failed to seek such an accommodation until after the department had voted. *Id.* ¶ 56. In December 2014, Dodd received a formal

6

rejection of her request for accommodation. *Id.* ¶ 58. In January 2015, Dodd again appealed the denial of her non-reappointment to then-President Coico, who, in March 2015, granted Dodd's appeal. *Id.* ¶¶ 60, 62.

Also in January 2015, Dodd filed a disability discrimination complaint with Baptiste against Cronin. *Id.* ¶ 61.

In June 2015, Baptiste issued a report concluding that Cronin had discriminated against Dodd, lied in order to deny her a reasonable accommodation, and retaliated against her by, among other things, "trying to distance [Dodd] from the program she oversaw." *Id.* ¶ 64. Baptiste recommended that Cronin be removed from his position as chair of the political science department and that Dodd be protected from future retaliation. *Id.* Notwithstanding Baptiste's recommendations, Cronin, in fall 2015, began overseeing Dodd's reappointment process. Dodd alleges that there were multiple procedural irregularities with her reappointment process, including voting changes, the use of an outdated CV, and the withholding of information that was favorable to Dodd. *Id.* ¶ 66.

On June 8, 2016, Dodd, CUNY, and CCNY representatives entered into a settlement agreement (the "Settlement Agreement") stipulating that Dodd would be reappointed for two years, through the 2017–18 academic year. *Id.* ¶¶ 71–72. The Settlement Agreement also stipulated, among other things, the following: CCNY would add two years to Dodd's tenure clock; Dodd's evaluation for the 2015–16 academic year would be conducted no later than October 31, 2016; Dodd would be able to object to whoever was selected to conduct her review; and Cronin would not conduct Dodd's teaching evaluations, set her schedule, or take part in any personnel decision involving her. *Id.* ¶ 72.

### C. Post-Settlement Events: Alleged Retaliation & Alleged Aiding and Abetting of Retaliation

Dodd contends that after the parties entered into the Settlement Agreement, Cronin and others engaged in a campaign of retaliation because of Dodd's complaints of discrimination. All of Dodd's claims in this action arise out of defendants' post-settlement conduct. In particular, Dodd alleges:

(1) In February 2017, Dodd was invited to teach a graduate seminar at the CUNY Graduate Center for the upcoming fall semester. *Id.* ¶ 82. Dodd told Driscoll, CCNY's then-interim Provost, that she wished to take the opportunity because she believed it would strengthen her tenure application. *Id.* Driscoll approved Dodd's participation but failed to follow up on the necessary paperwork. *Id* ¶ 85.

(2) Notwithstanding the provision in the Settlement Agreement that Cronin not participate in any personnel decisions involving Dodd, Cronin gave the CUNY Graduate Center a negative report on Dodd and informed the Graduate Center that he would not approve the proposed seminar. *Id.* ¶ 84.

(3) In response to Cronin's negative report, Dodd emailed Baptiste and Driscoll alleging that Cronin's involvement constituted a breach of the Settlement Agreement. Dodd requested an investigation into Cronin's conduct and asked Driscoll to inform the Graduate Center that Dodd was approved to teach the course. *Id.* ¶ 85. Driscoll delegated the task to Foster, a college dean. *Id.* Foster took no action for eight weeks, by which time the Graduate Center had already set the fall calendar and omitted Dodd's seminar from its course offerings. *Id.*

(4) Cronin violated the Settlement Agreement by continuing to attempt to supervise Dodd's course assignments and by excluding her from faculty emails. *Id.* ¶¶ 76, 81, 86.

(5) CCNY violated the Settlement Agreement by failing to arrange Dodd's annual evaluation by October 31, 2016. *Id.* ¶ 78.

(6) Driscoll further violated the Settlement Agreement by assigning Tartter, a psychology professor, to conduct Dodd's evaluation for the 2016–17 academic year without first allowing Dodd to object, as she was entitled to do under the Settlement Agreement. *Id.* ¶¶ 86–88.

(7) Tartter was allegedly hostile and adversarial while conducting Dodd's evaluation, remarking that Dodd's books were "taking forever." *Id.* ¶ 93. Dodd filed an internal complaint against Tartter alleging discrimination. *Id.* ¶ 94. The Professional Staff Congress ("PSC"), the union representing CUNY faculty members, filed a grievance supporting Dodd's objections and requesting that all documents relating to Tartter be removed from Dodd's personnel file. *Id.* ¶ 95.

(8) Occhiogrosso purposefully delayed Dodd's grievance requesting that Tartter's evaluation be removed from her file. This delay caused Tartter's negative evaluation to remain in Dodd's file during the tenure and reappointment process. *Id.* ¶¶ 95, 118, 123.

(9) In June 2017, just days after Dodd filed her complaint against Tartter, Krinsky told Dodd the deadline for sending out her manuscripts for tenure consideration had been changed from the end of July 2017 to the end of the same week. *Id.* ¶ 96. According to Krinsky, both Foster and Menon, among others in the department, supported the

schedule change. *Id.* Dodd objected and complained of Krinsky's conduct to Baptiste. *Id.* The change, Dodd alleges, gave her no opportunity to include an updated candidate statement—an important document in the tenure process—in her tenure file.

(10) Around June 2017, Dodd had completed a draft manuscript of a book to be published. The book was about to enter the editing process. *Id.* ¶ 97. Over Dodd's objections, Krinsky changed the status of the book, on Dodd's CV, to a "work in progress." *Id.* ¶ 97. Krinsky told Dodd he would alter the CV once Dodd submitted the edited manuscript. *Id.* On August 2, 2017, Dodd submitted the edited manuscript to Krinsky. *Id.* She later learned that Krinsky never altered her CV. *Id.*

(11) CUNY failed to pay Dodd the entirety of her supplemental salary. *Id.* ¶ 117.

(12) To the extent any individual defendants participated in the decision to terminate Dodd's Flom professorship title, their action resulted in the decrease of Dodd's salary. *Id.* ¶ 104.

(13) Boudreau denied Dodd's final-stage appeals for tenure and reappointment, effectively terminating her employment beginning August 2018. Pl. Br. at 5.

**D. Procedural History**

Dodd commenced this action on December 20, 2017. Dkt. 1. On March 7, 2018, defendants filed a motion to dismiss the initial complaint. Dkt. 8. Later that day, the Court issued an order directing Dodd to file an Amended Complaint by March 28, 2018. Dkt. 11. On March 28, 2018, Dodd filed an Amended Complaint. Dkt. 17. On April 18, 2018, defendants filed a motion to dismiss the Amended Complaint and a memorandum of law in support. Dkt. 23. On May 2, 2018, Dodd filed a memorandum of law in opposition and cross-moved for leave

10

to further amend her complaint. Dkt 24. On May 9, 2018, defendants filed a reply memorandum of law in support of defendants' motion to dismiss and in opposition to Dodd's motion to further amend her complaint. Dkt. 25.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

### A. Dodd Has Alleged A Plausible Claim Under the Rehabilitation Act

To state a viable retaliation claim under the Rehabilitation Act, a plaintiff is required to plead that (1) she engaged in protected activity, (2) the employer was aware of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action. *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002). At the pleading stage, a plaintiff asserting a retaliation claim must allege

11

facts plausibly supporting a minimal inference of retaliatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d. Cir. 2015).

### 1. The Complaint Alleges Sufficiently Adverse Employment Actions

Defendants first argue that Dodd's retaliation claim against CUNY fails because the majority of the alleged retaliatory acts are not sufficiently adverse to give rise to a plausible retaliation claim under the Rehabilitation Act. To constitute an adverse action in the context of a retaliation claim, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). In assessing whether conduct constitutes adverse employment action, the Court must consider the alleged acts of retaliation "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).[2]

Here, Dodd has alleged instances of conduct that, considered separately and together, are sufficiently adverse to sustain a retaliation claim. Indeed, defendants concede that three such acts are adverse enough to support a retaliation claim: (1) the Review Committee's decision to deny Dodd's application for early tenure and reappointment for the 2018–19 academic year; (2) the revocation of Dodd's Flom Professorship title and benefits; and (3) the partial repayment of

---

[2] Defendants argue that the Court should not consider plaintiff's alleged retaliatory acts in the aggregate. They contend that *Hicks* is distinguishable because that case involved a series of acts committed by a single supervisor; this case, by contrast, involves a number of discrete acts by separate faculty members and university administrators. This argument is unavailing. The Second Circuit has held that where a plaintiff alleges that multiple supervisors "collectively and persistently" act to thwart the plaintiff's professional ambitions, those allegations adequately establish the existence of retaliatory employment acts. *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018). Such is the case here.

12

"back pay for the supplemental portion of [Dodd's]" salary. *See* Def. Br. at 14–15. The Court agrees that each of these three alleged acts is independently severe enough to deter a reasonable employee from reporting or maintaining a discrimination claim.

Defendants contend that Dodd's remaining allegations "amount to nothing more than 'petty slights, minor annoyances, and simple lack of good manners.'" Def. Reply Br. at 2 (quoting *Burlington*, 548 U.S. at 68). But the Court cannot assess the impact of an act by considering each act in isolation. Even seemingly "trivial" acts can give rise to a cause of action if they form a larger pattern of retaliation. *See Hicks*, 593 F.3d at 165 (quoting *Zelnik*, 464 F.3d at 227). Here, Dodd has plausibly alleged a series of acts that, viewed in the aggregate, amount to a campaign to undermine her application for tenure. These include multiple alleged violations of the Settlement Agreement by Cronin and others, Dodd's exclusion from departmental communications, sudden schedule changes regarding Dodd's manuscript, alterations to Dodd's CV that went uncorrected, and the loss of an opportunity to teach a graduate seminar.

These alleged events, viewed holistically, could surely impair a professor's ability to successfully navigate the highly competitive tenure application process—a process in which even modest advantages or disadvantages could prove consequential. For example, Cronin's alleged practice of excluding Dodd from departmental communications could cut off the flow of important departmental information to Dodd and cause her to be ostracized from colleagues. *See Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 203 (2d Cir. 2006) (finding adverse employment actions where, among other things, plaintiff was excluded from meetings of the sort he previously attended); *see also Duplan*, 888 F.3d at 626 (holding that supervisors' attempts to ostracize plaintiff from others in his department was part of a "backdrop of continuing antagonism" against plaintiff). Accordingly, the Court holds, these alleged acts,

13

culminating as they did in the denial of Dodd's tenure, could dissuade a reasonable tenure candidate from making or supporting a discrimination charge. *See Curcio v. Roosevelt Union Free Sch. Dist.*, 10-CV-5612 (SJF)(AKT), 2012 WL 3646935, at *16 (E.D.N.Y. Aug. 22, 2012) (holding that "escalating criticisms and negative performance reviews" ultimately ending in a denial of tenure supported a retaliation claim).

### 2. The Amended Complaint Adequately Alleges Facts Causally Connecting Retaliatory Acts to Dodd's Protected Activity.

Defendants next argue that Dodd has failed to allege facts that plausibly connect her protected activity and the adverse actions she claims to have experienced. "To adequately plead causation, 'the plaintiff must plausibly allege that the retaliation was a but-for cause of the employer's adverse action. But-for causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan*, 888 F.3d at 625 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015) (alterations omitted). A plaintiff may show a causal connection either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as a disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Dodd has alleged that she suffered adverse employment actions shortly after engaging in protected activity. These allegations suffice to infer causation through temporal proximity. A complaint, even an informal complaint, can be considered protected activity if the employer "reasonably [could] have understood that [plaintiff] was complaining of conduct prohibited by Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)

14

(quotations omitted). Although there is no bright-line test to determine temporal proximity, courts in this Circuit have held that, without more, "a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011); *see also Thompson v. Morris Heights Health Ctr.*, No. 09-CV-7239 (PAE)(THK), 2012 WL 1145964, at *10 (S.D.N.Y. Apr. 6, 2012) (collecting cases).

Dodd's complaint alleges sufficiently adverse actions that came sufficiently close in time to protected conduct to support an inference of retaliation. Indeed, Dodd has pleaded a number of instances in which protected acts—*i.e.*, complaints that Dodd's employer reasonably should have understood to concern disability discrimination or retaliation—were followed shortly thereafter by adverse employment actions. The following examples are illustrative.

In August 2016, Cronin sent Dodd a number of supervisory emails. This conduct, Dodd alleges, violated the Settlement Agreement that the parties had adopted.[3] Am. Compl. ¶ 76. Dodd complained about Cronin's conduct to HR that same month. *Id.* Within two months,

---

[3] Defendants assert that Dodd's sole protected activity occurred in 2014 and 2015, when Dodd made disability-related complaints to Baptiste. Dodd's later complaints, defendants assert, "concerned alleged violations of the Settlement Agreement, not disability discrimination or retaliation, and, thus, these complaints do not constitute protected activity." Def. Reply Br. at 6. But this characterization views these actions by Dodd out of proper context. The Settlement Agreement was not a random contract. It arose out of Dodd's express request for a disability accommodation and her complaints that her employer, and her supervisor Cronin, were engaging in disability discrimination and retaliation. CUNY and CCNY were parties to this agreement. Indeed, the terms of the Settlement Agreement were expressly aimed at accommodating Dodd's disability and preventing retaliation for her previous disability-related complaints. For instance, the Settlement Agreement required that Dodd receive another two years on her "tenure clock" so that she could successfully meet tenure criteria notwithstanding her disability. Am. Compl. ¶ 72. Under these circumstances, when CUNY and CCNY received complaints from Dodd that the Settlement Agreement terms were being breached, they, at a minimum, "reasonably [could] have understood that [Dodd] was complaining" about conduct prohibited by disability discrimination laws. *Rojas*, 660 F.3d at 108.

15

Dodd claims, CUNY failed to conduct her professional evaluation by the date agreed to under the terms of the Settlement Agreement.

Similarly, Dodd avers that, in February 2017, she met with Driscoll to complain about "ongoing retaliation from Cronin, who excluded her from departmental emails." *Id.* ¶ 81. On February 23, 2017, just two weeks after Dodd protested Cronin's allegedly retaliatory behavior, Cronin informed the Graduate Center that he would not approve a proposed seminar that Dodd wished to teach and which Dodd believed would strengthen her tenure application. And, Dodd alleges, Driscoll and Foster failed to timely inform the Graduate Center that Dodd was in fact approved to teach the seminar, resulting in Dodd's losing her opportunity to teach that course.

In October 2017, Dodd's counsel notified CUNY that she intended to file the instant action. *Id.* ¶¶ 99, 101. The following month, Dodd learned that her Flom Professor title and benefits would be cancelled. *Id.* ¶ 104.

Finally, in December 2017 Dodd filed this lawsuit. *See* Dkt. 1. Shortly thereafter, on February 8, 2018, the Review Committee voted to deny Dodd's reappointment and her tenure application.

In sum, the close temporal proximity between various of Dodd's protected acts and various ensuing adverse employment actions are sufficient to support the inference that defendants' adverse actions towards Dodd during the period in question were motivated, at least in part, by a desire to retaliate against her for her complaints.

### 3. Hostile Work Environment Claim

Dodd has clarified that she is not asserting any hostile work environment claims. Pl. Br. at 9 n.2. Accordingly, the Court does not address defendants' argument that Dodd fails to satisfy the elements of a hostile work environment claim.

16

### B. The Allegations in the Amended Complaint State a Cause of Action Against the Individual Defendants

Defendants next argue that Dodd's claim that the individual defendants violated the HRL must be dismissed. Liability may be imposed on an individual defendant under the HRL if the individual is either an "employer" within the meaning of the statute, N.Y. Exec. Law § 296(1), or if the individual aided, abetted, incited, compelled, or coerced a discriminatory act committed by an employer, *id.* § 296(6). Defendants contend, and Dodd does not dispute, that CUNY cannot be liable under the HRL as a matter of law because it enjoys sovereign immunity from suit under the Eleventh Amendment.[4] Thus, defendants argue, all claims against the individual defendants must be dismissed, on the ground that the individual defendants cannot be liable for aiding and abetting an institution that is not subject to suit under the HRL.

The Court has no occasion to reach this issue, however, because a different defendant qualifies as an "employer." As all concede, President Boudreau—who began serving as interim President in November 2016, before virtually all of the post-settlement acts of which Dodd complains—had sufficient independent authority to be considered an "employer" within the meaning of the statute, N.Y. Exec. Law § 296(1).[5] *See* Def. Br. at 21; Pl. Br. at 18. Because Dodd has adequately pleaded that Boudreau retaliated against her for her protected activity after he became CUNY President, *see* Am. Compl. ¶¶ 106, 107, 111, it follows that Dodd's HRL claims against the other individual defendants may proceed on the theory that such defendants

---

[4] Defendants also argue that the Court should decline to exert supplemental jurisdiction over Dodd's HRL and NYCHRL claims if it dismisses Dodd's Rehabilitation Act claim. Because the Court has sustained that claim, this argument is moot.

[5] "An individual qualifies as an 'employer' when that individual has an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'" *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984) (per curiam)).

aided and abetted discriminatory acts committed by Boudreau in his capacity as Dodd's employer.

### C. Dodd's Motion For Leave to Amend

Dodd seeks leave to further amend her complaint to (1) add new factual allegations relating to her existing claims, (2) invoke diversity jurisdiction pursuant to 28 U.S.C. § 1332 as an extra basis for subject matter jurisdiction, (3) add three new instances of retaliation, and (4) add a claim under the ADA against Boudreau in his official capacity. Pl. Br. at 22–24. The Court addresses each request in turn.

#### 1. Request To Add New Information Relating to Existing Claims

The Court denies Dodd's request for leave to further amend her complaint to add new information relating to her existing claims. Dodd had a full and fair opportunity to do so when this Court allowed her to file an Amended Complaint in March 2018. Dkt. 11. Dodd has not shown good cause to further amend along these lines. Nor is there evident need for her to do so: While the new facts she recites may "provide more context," Pl. Br. at 23, they do not appear to alter her claims substantively.

#### 2. Request To Add Diversity Jurisdiction as a Basis for Jurisdiction

The Court denies Dodd's request to invoke diversity jurisdiction as an additional basis for this Court's exercise of jurisdiction. Pl. Br. at 23. For the reasons above, Dodd's existing complaint adequately pleads violations of federal statutes so as independently to supply federal jurisdiction. There is therefore no need, at this stage, to plead diversity jurisdiction "to avoid a dismissal on purely technical grounds." *Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 103 (2d Cir. 1997).

#### 3. Request To Allege New Instances of Retaliation

The Court grants Dodd's request to amend her complaint to add the following instances of retaliation: (1) Boudreau's final denial of Dodd's tenure and reappointment appeals; (2) Occhiogrosso's conduct at an April 2018 hearing reviewing Dodd's grievance concerning Tartter's negative evaluation; and (3) CCNY's termination of Baptiste, an employee who advocated for Dodd. Each of these instances occurred after Dodd filed her Amended Complaint on March 28, 2018. And Dodd moved quickly thereafter, seeking leave to so amend on May 2, 2018. The Court therefore finds no undue delay, bad faith, or dilatory motive on Dodd's part. Furthermore, defendants do not claim that adding these allegations will be unfairly prejudicial.

### 4. Request To Bring A Claim Against Boudreau Under the ADA

Dodd also seeks to amend her complaint to add a claim for injunctive relief against Boudreau, in his official capacity, under the ADA, 42 U.S.C. § 1201. At the time of her Amended Complaint, Dodd had been barred from seeking such relief, because a prerequisite to doing so had been the filing of a timely complaint with the Equal Employment Opportunity Commission ("EEOC") and the receipt of a right-to-sue letter. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001); *see also* 42 U.S.C. § 12117 (incorporating Title VII exhaustion requirements into the ADA). Dodd gave the Court and defendants timely notice of her intent to amend upon receipt of such a letter, and thereafter sought to do so promptly after receiving one. The Court therefore grants Dodd's request to amend to seek such relief.

## CONCLUSION

For the reasons above, the Court denies defendants' motion to dismiss Dodd's Amended Complaint; grants Dodd's cross-motion for leave to further amend her complaint to add certain

19

new instances of retaliation and to assert a claim against Boudreau under the ADA; and otherwise denies Dodd's cross-motion for leave to further amend.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: September 7, 2018
      New York, New York