UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LYNDA G. DODD,

                                    Plaintiff,

              -v-

THE CITY UNIVERSITY OF NEW YORK,
VINCENT BOUDREAU, BRUCE CRONIN,
PAUL OCCHIOGROSSO, MARY IRINA
DRISCOLL, KEVIN FOSTER, JOHN KRINSKY,
RAJAN MENON, and VIVIEN TARTTER,

                                    Defendants.

---

17 Civ. 9932 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

        This case involves claims that a city university's denials of tenure and reappointment to a

political science professor were acts of unlawful retaliation, based on her having made claims

against university officials of disability discrimination and retaliation.  Plaintiff Lynda Dodd

brings this lawsuit against her former employer, the City University of New York ("CUNY"),

and CUNY officials.  Dodd's federal claims of retaliation are against CUNY, under the

Rehabilitation Act of 1973, 29 U.S.C. § 794(d), and against the president of a college within

CUNY, Vincent Boudreau, in his official capacity, under the Americans with Disabilities Act, 42

U.S.C. § 12101 *et seq*. ("ADA").  Dodd also brings state- and city-law claims of retaliation, or

aiding and abetting retaliation, against, in their individual capacities, CUNY employees

Boudreau, Bruce Cronin, Paul Occhiogrosso, Mary Erina Driscoll, Kevin Foster, John Krinsky,

Rajan Menon, and Vivien Tartter (the "individual defendants").  These are brought under the

New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New

York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  As relief,

Dodd seeks damages and injunctive relief, including an order compelling defendants to reinstate her as a faculty member, now with tenure.

Defendants have moved for summary judgment on all claims.  For the reasons that follow, the Court grants defendants' motion for summary judgment as to Dodd's NYSHRL and NYCHRL claims against Tartter, Menon, Driscoll, Foster, and Occhiogrosso, and denies defendants' motion for summary judgment in all other respects.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

CUNY is a public university established under the laws of the State of New York.  JSF ¶ 1.  The City College of New York ("CCNY") is a senior college within CUNY.  *Id.*  The Colin

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including: the parties' joint statement of stipulated facts, Dkt. 84 ("JSF"); defendants' Local Rule 56.1 statement, Dkt. 99 ("Def. 56.1"); Dodd's Local Rule 56.1 counter-statement, Dkt. 112 ("Pl. 56.1"); and defendants' response to Dodd's Local Rule 56.1 counter-statement, Dkt. 132 (Def. Reply 56.1").  The Court also has considered the declaration of Matthew Lawson, Esq., Dkt. 100 ("Lawson Decl."); the declaration of Vincent Boudreau, Dkt. 101 ("Boudreau Decl."); the declaration of Bruce Cronin, Dkt. 102 ("Cronin Decl."); the declaration of Daniel DiSalvo, Dkt. 103 ("DiSalvo Decl."); the declaration of John Krinsky, Dkt. 104 ("Krinsky Decl."); and the declaration of Paul F. Occhiogrosso, Dkt. 106 ("Occhiogrosso Decl."), each in support of defendants' motion for summary judgment, along with the exhibits attached to those declarations.  The Court has further considered the declaration of Thomas Bellifemine, Esq., Dkt. 113 ("Bellifemine Decl."); the declaration of Lynda G. Dodd, Dkt. 114 ("Dodd Decl."); the declaration of Charles R. Epp, Dkt. 115 ("Epp Decl."); the declaration of Paul Frymer, Dkt. 116 ("Frymer Decl."); the declaration of Julie Novkov, Dkt. 117 ("Novkov Decl."); the declaration of Joel Sati, Dkt. 118 ("Sati Decl."); and the declaration of Anne L. Clark, Esq., Dkt. 120 ("Clark Decl."), in opposition to the defendants' motion, along with the exhibits attached to those declarations.  Finally, the Court has considered the reply declaration of Paul F. Occhiogrosso, Dkt. 129 ("Occhiogrosso Reply Decl."); the reply declaration of Bruce Cronin, Dkt. 130 ("Cronin Reply Decl."); and the declaration of Erin P. Kandel, Dkt. 131 ("Kandel Decl."), along with the exhibits attached to those declarations.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary

L. Powell School for Civic and Global Leadership (the "Powell School") is an academic division of CCNY that houses, *inter alia*, the Political Science Department. *Id.*

Dodd was an associate professor in CCNY's Political Science Department between 2010 and 2018. *Id.* ¶ 2. During this period, she was also the inaugural Joseph H. Flom Professor of Legal Studies. *Id.* The Flom Professorship, which was discontinued after 2019, was associated with the Skadden, Arps Honors Program in Legal Studies (the "Skadden Program") within the Powell School at CCNY. At all relevant times, both the Skadden Program and the Flom Professorship were partially funded by the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). *Id.* ¶¶ 11–12. Shortly after she was hired, Dodd was diagnosed with multiple sclerosis ("MS"). *Id.* ¶ 27.

The individual defendants are each CCNY employees. *Id.* ¶¶ 3–10.

Boudreau is CCNY's current President and, between November 2016 and December 2017, served as its interim President. *Id.* ¶ 3. Between January 2014 and November 2016, he was Dean of the Powell School. *Id.* Before that, he was a professor in CCNY's Political Science Department and served as the chair of the hiring committee for the Flom Professor position. In that capacity, he hired Dodd to work at CCNY. *Id.*; Pl. 56.1 ¶ 251.

Occhiogrosso is Executive Counsel to CCNY's President. He has also served as CCNY's labor designee at various times, including since December 2016. JSF ¶ 5.

---

evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Driscoll is currently the Dean of CCNY's School of Education. *Id.* ¶ 6. Between August 2016 and March 2018, she served as CCNY's interim Provost and Senior Academic Vice President. *Id.*

Foster is currently Associate Dean of the Powell School. Between November 2016 and February 2019, he served as its interim Dean. *Id.* ¶ 7.

Cronin is a tenured professor in CCNY's Political Science Department. Between 2012 and 2018, he served as the Department's chair. *Id.* ¶ 4.

Krinsky is also a tenured professor in CCNY's Political Science Department. Between 2009 and 2012, he served as its chair (*i.e.*, immediately before Cronin). *Id.* ¶ 8.

Menon is also a tenured professor in CCNY's Political Science Department. *Id.* ¶ 9.

Tartter is a tenured professor in CCNY's Department of Psychology. *Id.* ¶ 10.

### 2. Tenure and Reappointment Procedures at CCNY

#### a. *Procedures for reappointment and tenure*

At CCNY, tenure-track faculty like Dodd are generally considered for reappointment annually. *Id.* ¶ 14. The reappointment process includes three successive levels of review by three separate committees. *Id.* ¶ 15.

First, within a faculty member's department (in Dodd's case, the Political Science Department), a committee consisting of that department's chair and four other faculty members votes whether to recommend the faculty member for reappointment. *Id.* That committee is called the "Executive Committee." *Id.*

Second, the Personnel and Budget Committee ("P&B Committee") of the school or division that houses the faculty member's department (in Dodd's Case, the Powell School) votes whether to accept that recommendation. *Id.* The P&B Committee consists of the chairs of each

department within the school or division and the dean of that school or division, who may deliberate but not vote. *Id.*

Third, the CCNY-wide Personnel & Budget Committee ("Review Committee") votes whether to reappoint. The Review Committee consists of CCNY's Provost, the deans of CCNY's eight schools and divisions, and two *ex officio* faculty members who may vote. *Id.*

Reappointment also requires the approval of CCNY's President and then the Chancellor of CUNY. *Id.* At each stage, a faculty member who receives a negative recommendation by any of these three committees may appeal to the next highest committee. *Id.* ¶ 16. In the case of a negative decision by the Review Committee, such an appeal must be made to CCNY's President. *Id.*

The tenure-review process generally occurs during a faculty member's seventh year of creditable, continuous, full-time service. It entails a similar path. The main difference is that at the first step, the department's Tenure Committee, rather than its Executive Committee, votes whether to recommend tenure. *Id.* ¶ 19. The Tenure Committee consists of tenured faculty members within the candidate's department. *Id.* From there, the P&B Committee and the Review Committee each hold successive votes. *Id.* The decision to grant tenure also requires approval by CCNY's President and the CUNY Chancellor. *Id.* As with reappointment, candidates who apply for tenure and receive a negative recommendation from any of these committees may appeal to the next highest committee, up to CCNY's President. *Id.* ¶ 20.

b.      *Standards for assessing reappointment and tenure*

The standards governing faculty reappointment and tenure at CUNY and CCNY are set out in various documents, plans, and agreements produced by different entities at the university, and the CUNY Board of Trustees has established criteria for each process. *See id.* ¶ 13.

As to the standards for reappointment, these are set out in the "Statement of the Board of Higher Education on Academic Personnel Practice in the City University of New York."  *Id.*; *see* Joint Ex. 1 ("Statement of the Board").  It states that reappointment "shall be evaluated on the basis of": (1) teaching effectiveness; (2) scholarly and professional growth; (3) service to the institution; and (4) service to the public.  Def. 56.1 ¶ 17.  It further provides that "[j]udgments on reappointment should be progressively rigorous."  *Id.* ¶ 19.[2]

As to the standards for tenure, the Statement of the Board requires that tenure decisions be based primarily on two criteria: (1) scholarship and professional growth; and (2) teaching effectiveness.  *Id.* ¶ 29.  It adds that service to CUNY and service to the public are also "factors" that "may be supplementary considerations in decisions on tenure."  *Id.* ¶ 30.[3]

In addition, in fall 2012, the Political Science Department's Executive Committee approved guidelines on its expectations for tenure.  JSF ¶ 22; Joint Ex. 8 ("2012 Tenure Guidelines").  These set out, in rank order, the value of various forms of scholarly publications in the tenure context.  "Single-authored books published by university presses" top this list.  2012 Tenure Guidelines at 2.  "[D]rafts of articles in progress" are at the bottom.  *Id.* at 3.  As to books, the guidelines state that, although "[e]dited or co-edited volumes published by academic presses

---

[2] Other documents relevant to the standards for reappointment are: (1) the Bylaws of the CUNY Board of Trustees, *see* Joint Ex. 2 ("CUNY Bylaws"); (2) the CUNY Code of Practice Regarding Instructional Staff Titles; (3) the Resolution of the Board of Higher Education on Personnel and Budget Procedures; (4) the CCNY Policies and Guidelines for Reappointment, Tenure, and Promotion; and (5) the collective bargaining agreement ("CBA") between CUNY and the Professional Staff Congress ("PSC"), the union that represents faculty at CUNY.  *Id.* ¶ 13.

[3] Dodd also identifies the following documents as establishing criteria related to tenure: (1) the CUNY Bylaws; (2) the CCNY Policies and Guidelines for Reappointment, Tenure, and Promotion; (3) a memorandum on the tenure clock by former-Chancellor James B. Milliken; and (4) a memorandum on early tenure consideration written by CUNY Chancellor Felix V. Matos Rodriguez while he was chancellor of Queens College, another CUNY senior college.  Pl. 56.1 ¶¶ 29, 279.

are not considered as book credits," such volumes "will, however, be considered as additional publications to be considered in our overall evaluation of the candidate." *Id.* at 2. As to articles, the guidelines state that "[s]ingle-authored articles published in peer-reviewed journals" are the most valued, followed by co-authored articles in such journals, sole-authored book chapters published in academic presses, and, last, articles in non-peer-reviewed academic journals. *Id.*

The guidelines state that the Department "will not be wedded to specific numbers" in considering a tenure application. *Id.* at 3. But they give several examples of combinations of scholarly work that "suggest[] scholarly achievement worthy of tenure." *Id.* One such combination consists of (1) one sole-authored scholarly book; (2) three to four peer-reviewed journal articles; (3) a future research project different from the book and articles; and (4) several conference papers. *Id.*; Def. 56.1 ¶ 45. The guidelines also discuss service and teaching criteria.

           *c.*    *Early tenure*

As noted, tenure-track faculty members most often apply for tenure in the fall of their seventh year. JSF ¶ 17. However, a faculty member may also request tenure consideration before this time, through CCNY's "early-tenure" process. Generally, the procedures through which a faculty member applies for early tenure mirror those for regular tenure: Although there is an additional screening vote at the outset, *see* Pl. 56.1 ¶ 28, the bulk of the early-tenure process consists of three successive votes by the Tenure Committee, P&B Committee, and Review Committee, followed by approval (or disapproval) by the CCNY President, *see* JSF ¶ 19. As with regular tenure, a faculty member may also appeal a negative decision as to early tenure by one of these committees to the next highest level of review. *Id.* ¶ 20.

The documents setting out the standards governing early-tenure applications make clear that early tenure is the exception, not the rule. The Statement of the Board provides that "[o]nly in exceptional cases may tenure be granted before" a faculty member's seventh year of service at

CCNY.  Def. 56.1 ¶ 32.  It identifies such "exceptional cases" as (1) when another institution of higher learning previously awarded a faculty member tenure; (2) when service at CCNY is interrupted by a prestigious fellowship; and (3) "some extraordinary reason indicates that the college would be well served by the early grant of tenure."  *Id.*  The CUNY Bylaws similarly state that grants of early tenure should be limited to similar situations, including where, "for a very substantial reason the college would be well served by such early grant of tenure."  *Id.* ¶ 33.

The parties construe differently the implications these standards have for the scholarship expected of an early-tenure candidate.  Defendants, emphasizing the extraordinary nature of early tenure, argue that it demands more, or higher-quality, scholarship than from a regular tenure applicant.  *See, e.g.*, Def. Mem. at 6.  They contend that early tenure is harder to achieve not merely because the ordinary requirements for tenure are harder to meet within a shorter timeframe, but also because the quantity and/or quality of an applicant's scholarship must be more impressive at the early stage than would be required after a full seven years.  *See* Def. Reply at 6.  Dodd, however, construes the documents above to mean that early tenure is extraordinary simply because it is unlikely that a scholar, within a shortened timetable, will satisfy the *regular* tenure standard.  *See* Pl. 56.1 ¶¶ 14, 27–28, 32, 38, 271–280.  She contends that the same substantive standards (*i.e.*, the standards for quantity and quality of scholarship) apply to all tenure applicants, regardless of timing.

### 3.    Dodd's Background, Hire, and MS Diagnosis

Dodd earned a PhD from Princeton University and a law degree from Yale Law School.  JSF ¶ 25.  She then worked for two years as a professor of political science at Miami University of Ohio and for five years as a law professor at American University's Washington College of Law.  Clark Decl., Ex. 322 ("August 2017 CV") at 10.  Her primary area of scholarship is constitutional tort litigation.  *See* Def. 56.1 ¶ 48.

8

In January 2010, Dodd joined the CCNY faculty as a tenure-track associate professor, and was designated CCNY's inaugural Flom Professor.  *See* JSF ¶¶ 23–25.  In his memo recommending Dodd for the Flom post, Boudreau, then chair of the Flom hiring committee, noted Dodd's "extraordinary qualifications."  Pl. 56.1 ¶ 255.  He wrote that Dodd "far exceeded all other candidates in terms of her qualifications and experience," and concluded that "in every respect—her interview, her presentation and her vision for the program—Lynda Dodd was head and shoulders above the rest of the candidates."  *Id.*

According to a supplemental letter Dodd received when she was hired, in connection with the Flom Professorship, Dodd received a salary supplement equal to one-third of her base salary and took on a reduced course load, carrying one fewer class than other non-tenured faculty members.  *Id.* ¶ 259.  At the same time, Dodd was assigned additional duties: leading the Skadden Program, creating its academic curriculum, teaching honors seminars, advising students, and working with Skadden to promote the reputation of the program.  *Id.* ¶ 258.

At the time Dodd was hired, she had not been diagnosed with MS.  *Id.* ¶¶ 256–257.  In spring 2010, however, soon after being hired, she received her diagnosis.  *Id.* ¶ 262.  Soon after, in May 2010, she informed Krinsky, then chair of the Department, of that diagnosis.  *Id.* ¶ 263.  Initially, Dodd experienced fatigue and mobility challenges, as well as a series of viral infections that she contracted because her MS medication suppressed her immune system; over the next several years, her condition worsened.  *Id.* ¶¶ 265–268.  By January 2014, a neurologist advised Dodd that her experience was consistent with primary progressive MS, "the more severe form of the disease."  *Id.* ¶ 270.

### 4.    Dodd's Scholarship

When Dodd arrived at CCNY in 2010, she had published three articles in various journals and collections.  *See* August 2017 CV at 4.

Between her arrival at CCNY in 2010 and 2016, Dodd published one law review article in 2010, one book chapter in a collected work in 2011, a second law review article in 2013, and a cover article in a prestigious peer-reviewed journal of political science in 2015. *Id.* The latter was the only peer-reviewed article she published while at CCNY. *See id.*; Lawson Decl., Ex. B ("Dodd Tr.") at 123, 129. In 2017, Dodd edited and published with Cambridge University Press a collected volume of essays by various scholars ("*The Rights Revolution Revisited*"), which included three chapters that Dodd herself wrote. August 2017 CV at 3; Def. 56.1 ¶ 50.

During her time at CCNY, Dodd never published a sole-authored book. However, Cambridge University Press accepted for publication two such books that have yet to be published. *See* Pl. 56.1 ¶¶ 48–49; Dodd Decl. ¶¶ 52, 54. The first, *Taming the Rights Revolution*, was accepted for publication in summer 2017. *See* Def. 56.1 ¶ 180.

### 5.    Pre-Settlement Evaluations and Requests for Accommodation

As a tenure-track faculty member, Dodd was subject to an annual reappointment process. JSF ¶ 14. Her appointment as Flom Professor was also separately reviewed annually between June 2011 and June 2014. Pl. 56.1 ¶ 55. Dodd, however, at all relevant times contested the propriety of this separate review process. *Id.* She contended that she had not been notified of this separate reappointment review during her application process, in her hiring paperwork, or in her first year of service, and that she learned of it after her MS diagnosis. *Id.* ¶ 290. Department chair Cronin, however, attested that the Department had introduced this review for "endowed professors" around the time of Dodd's arrival. *Id.* ¶ 291. And the defendants cite a 2015 letter from the Provost's office identifying a "long-standing practice at City College" of conducting annual reviews of "Distinguished Professors and individuals appointed to Named Chair and Professorship positions." Def. Reply 56.1 ¶ 290. Countering this, Dodd maintains that the Flom Professorship was neither an endowed chair nor a named chair. Pl. 56.1 ¶ 253.

In connection with Dodd's reappointments between 2011 and 2015, *see* JSF ¶¶ 32, 35, 40, her department chairs—first Krinsky and then Cronin—registered, including in written evaluations, increasing concerns about Dodd's pace of academic production. *See, e.g.*, Def. 56.1 ¶¶ 57, 77. For example, in March 2013, Cronin wrote a letter to the P&B Committee, which Dodd received, expressing "dismay[] at the low level of productivity for a named professorship." Joint Ex. 21 at 1.

The evaluations to this effect often noted a mismatch between Dodd's "prestigious named chair" and her (as described) spare publication record. *See, e.g.*, Def. 56.1 ¶ 58. Dodd contested that her Flom Professorship carried any heightened publication expectations. *See, e.g.*, Pl. 56.1 ¶¶ 104, 252–254, 305. As time went on, however, these evaluations criticized Dodd's publications as "light" not only for an "Associate Professor and named chair, but also for a faculty member nearing the end of her third year of creditable service." Def. 56.1 ¶¶ 81–82, ¶ 104.

Recognizing that her MS impaired the pace at which she was able to produce scholarship, Dodd sought disability accommodations. On May 23, 2013, she first met with then-Provost Maurizio Trevisan and showed Trevisan her medical records, identified herself as an employee with a disability, and requested an accommodation to address "the difficulties associated with her MS which affected the speed and pace of her research production." Pl. 56.1 ¶ 299. Also in May 2013, Dodd asked HR personnel to clarify the "essential duties" of her Flom Professorship, in light of Krinsky and Cronin's suggestions that the post carried heightened scholarly expectations. *Id.* In June 2013, a CCNY employee informed Dodd that "[t]he Flom Professor is not a 'named' professor. The professor was hired on standard academic line with a supplement provided by the Skadden Arps gift." *Id.* ¶ 302. In October 2013, HR, responding to Dodd's request, advised her

that the essential duties relating to the Flom title were those set out in her 2009 supplemental offer letter. *Id.* ¶ 305.

In December 2013, Dodd requested that CCNY clarify her "essential duties," for purposes of the ADA, and engage in negotiations regarding a reasonable accommodation of her disability with respect to the separate review process for the Flom Professorship. *Id.* ¶ 307. In March 2014, CCNY denied her request on the grounds that there was no separate review process for the Flom Professorship. *Id.* ¶ 315.

Between 2014 and 2016, criticism of Dodd's scholarship resulted in a number of negative votes on her reappointment, each of which was ultimately reversed on appeal. These negative votes also led Dodd to continue pressing for accommodations of her disability.

Specifically, on April 12, 2014, Cronin wrote to the P&B Committee that the Executive Committee "reluctantly recommends" Dodd's renewal as Flom Professor for 2014–2015. Def. 56.1 ¶ 84. He noted that her "scholarship continues to be a very serious concern" especially given what "is expected of a named chair." *Id.* ¶¶ 85–86. On April 30, 2014, the Review Committee voted against Dodd's reappointment as Flom Professor. *Id.* ¶ 87. Dodd, however, appealed to then-President Lisa Coico, who overturned the denial. *Id.* ¶¶ 89–90.

In August 2014, Boudreau, then Dean of the Powell School, sent Dodd her "Three-Year Evaluation." *Id.* ¶ 92. Among other criticisms, it noted that Dodd "has worked at a pace far below the standard we set for untenured assistant professors fresh out of graduate school—despite her reduced teaching load and longer professional experience." *Id.* ¶ 96. It concluded that, "[a]bsent an improvement in her publication record, it is difficult to see that she is a viable candidate for continued reappointment, and subsequently for tenure and promotion." *Id.* ¶ 97.

On September 4, 2014, Dodd met with Cronin.  Dodd testified that at this meeting she requested an accommodation "to give her time to complete the research expected for tenure." Pl. 56.1 ¶ 364.  Cronin testified that he referred Dodd to HR, because he lacked "authority to grant or even evaluate a request like that."  Def. Reply 56.1 ¶ 377.

On September 5, 2014, the Executive Committee voted not to reappoint Dodd as associate professor for the 2015–2016 academic year.  Def. 56.1 ¶ 99.  On September 16, 2014, the day she was notified of this vote, Dodd wrote to Michele Baptiste, CCNY's dean of diversity, requesting a reasonable accommodation of her disability.  *See* Joint Ex. 39.  Baptiste responded that Boudreau and Cronin opposed the requested accommodations on the ground that Dodd had failed to seek such an accommodation until after the Executive Committee's vote.  Pl. 56.1 ¶ 377.

On October 14, 2014, the P&B Committee voted not to reappoint Dodd for the 2015–2016 academic year.  Def. 56.1 ¶ 108.  On December 10, 2014, the Review Committee did the same. *Id.* ¶ 109.  Also in December 2014, Baptiste notified Dodd that her accommodation request had been formally denied because Dodd had not made the request until after the Executive Committee's vote, such that granting an accommodation at that point would require the reversal of several committees' votes.  Pl. 56.1 ¶ 382.  On December 19, 2014, Dodd's attorney sent CUNY a letter asserting disability discrimination claims on Dodd's behalf.  *Id.* ¶ 385.

On January 10, 2015, Dodd appealed the Review Committee's vote to President Coico. Def. 56.1 ¶ 110.  Several days later, Dodd filed a disability discrimination complaint against Cronin with Baptiste regarding his alleged September 4, 2014 refusal to provide her with an accommodation, and subsequent denial that she had requested such an accommodation.  Pl. 56.1 ¶ 388.  On March 10, 2015, President Coico—for the second time—ruled in Dodd's favor on her appeal.  This resulted in Dodd's reappointment as associate professor.  Def. 56.1 ¶ 110.

Two days later, on March 12, 2015, Cronin wrote to Dodd informing her that she would have to change the schedule for one of her courses from a once-a-week class to a twice-a-week class. Dodd states that his schedule was difficult for her in light of her MS. Pl. 56.1 ¶ 395. Boudreau also altered that course such that the students in it would be political science students, not students in the Skadden Program. Def. Reply 56.1 ¶ 396. Boudreau testified that he did so because Skadden had "asked for [Dodd's] role in the program to be reduced." *Id.*

On March 23, 2015, Dodd filed a second disability discrimination complaint against both Cronin and Boudreau with Baptiste. Pl. 56.1 ¶ 399. It alleged that each had "interfere[d] w[ith] reasonable accomm[odation] effort," "changed Skadden courses in response to [reappointment]," and "retaliat[ed] in response to reappointment." Joint Ex. 48 at 2.

In June 2015, Baptiste issued a report concluding that Cronin had discriminated against Dodd and that Boudreau had retaliated against her. Pl. 56.1 ¶ 409. Baptiste's report faulted Cronin for failing to act on Dodd's September 4, 2014 request for an accommodation, as well as for misrepresenting to Baptiste that Dodd had not requested an accommodation until after the September 5, 2014 Executive Committee vote. Joint Ex. 50 ("Baptiste Report") at 7. *But see* Pl. 56.1 ¶ 430 (Cronin described Dodd's claims as "bogus" and Baptiste's findings as "border[ing] on libel"); Def. Reply 56.1 ¶ 409 (characterizing Baptiste's findings as "inexplicable" and immaterial). Baptiste's report further faulted Boudreau for "distanc[ing] Prof. Dodd from the Skadden program" after her reappointment, and for supporting Cronin's actions. Baptiste Report at 9. *But see* Def. Reply 56.1 ¶ 409 (contesting Baptiste's findings). Ultimately, the report recommended that Cronin be removed from his position as chair, that Boudreau receive a letter of discipline, and that Dodd be protected from further retaliation within the Department. *See* Baptiste Report at 9.

Notwithstanding Baptiste's report, Cronin remained Department chair, and in fall 2015 he began overseeing Dodd's reappointment process for 2016–2017.  Pl. 56.1 ¶¶ 445–458.  On November 11, 2015, Dodd learned that the Executive Committee had voted not to reappoint her for the 2016–2017 academic year.  *Id.* ¶ 462.  The Committee was then composed of Krinsky, Menon, Cronin, and two other political-science professors—Daniel DiSalvo and Sherrie Baver—although Cronin recused himself from the ultimate vote on reappointment.  *Id.*

While Dodd's appeal of this decision pended, Boudreau altered a Powell School alumni publication to remove favorable remarks about Dodd by a student, by changing a quote that had originally praised "Professor Dodd's class" to instead praise "my Skadden class."  *Id.* ¶¶ 469–470.  Boudreau testified that he made this change because, given the decision not to reappoint Dodd and the likelihood that "there may be adverse publicity around Professor Dodd's case one way or another," he "didn't want the advertisement of our accomplishments to include a reference to Professor Dodd."  Def. Reply 56.1 ¶ 470.  Boudreau added that the publication was intended to highlight the achievements of CCNY's graduates, not its faculty.  *Id.*

On November 23, 2015, Dodd filed with Baptiste a third set of complaints—specifically, disability-discrimination and retaliation complaints against Boudreau, Cronin, Occhiogrosso, and Menon.  JSF ¶ 75.  After Menon, Boudreau, and Occhiogrosso requested that their complaints be handled by someone other than Baptiste, the matters were reassigned to CUNY's Director of HR Investigations, Pinar Ozgu.  *See* Pl. 56.1 ¶ 473.

On June 1, 2016, Ozgu notified President Coico that she had found Dodd's complaints unsubstantiated.  *Id.* ¶ 491.  Ozgu concluded that Dodd's complaints did not identify discrimination or retaliation by any person named in the complaints.  *Id.*  Dodd was first notified of these findings on June 13, 2016.  *Id.* ¶ 494.

15

During this period, as discussions were held regarding Dodd's requested accommodation and the various complaints she filed, the possibility of negotiating a settlement resolving both issues together occasionally arose. *See, e.g.*, Pl. 56.1 ¶¶ 393, 421. In October 2015, Dodd notified Baptiste that Dodd would be represented by counsel in any further negotiations. *Id.* ¶¶ 438, 440.

On June 8, 2016, Dodd entered into a settlement agreement with the PSC, CUNY, and CCNY. *Id.* ¶ 497. It provided that Dodd would be reappointed for two years, for the 2016–2017 and 2017–2018 academic years, but that those years would not count as creditable years toward tenure. *Id.* ¶ 501; *see* Joint Ex. 63 ("Settlement Agreement" or "Agreement") § 2. It further provided, *inter alia*, that: (1) CUNY would add two years to Dodd's tenure clock, meaning that she would not be required to apply for tenure until fall 2019; (2) Dodd's evaluation for the 2015–2016 academic year would be conducted no later than October 31, 2016; (3) Dodd would be able to object to whomever was selected to conduct her evaluations; and (4) Cronin would not take part in any personnel decision involving Dodd. Pl. 56.1 ¶¶ 500–510. Dodd, in turn, agreed to release all legal claims relating to events that occurred before the Agreement. Def. 56.1 ¶ 112.

Around August 2016, Driscoll was appointed Interim Provost, which meant that she would have a role in administering the Settlement Agreement. Pl. 56.1 ¶ 518.

### 6.    Post-Settlement Events

Dodd's claims in this case arise from actions taken after the execution of the Settlement Agreement. She alleges that, soon after that point, various defendants began to violate its terms and to retaliate against her for her protected activities. These actions, she alleges, culminated in the denial of her application for tenure and reappointment in 2018. The Court reviews each episode in turn.

a. *Cronin's involvement in Dodd's employment*

In August 2016, Cronin sent an email to Dodd, and the entire Department, regarding the spring 2017 Department course schedule. *Id.* ¶ 519. Dodd immediately complained to Driscoll about Cronin's involvement, contending that Cronin's involvement in scheduling her courses violated the Settlement Agreement's prohibition on his involvement in her employment. *Id.* ¶¶ 520–521. Dodd also complained that Cronin had excluded her from certain other informational emails, although she does not identify most of these, relying instead on her own testimony to support this allegation. *Id.* ¶ 536.

b. *Cronin's refusal to allow Dodd to teach graduate courses*

On September 9, 2016, Charles Tien, a professor at the CUNY Graduate Center, emailed Dodd, inviting her to teach a course on "constitutional development" at the Graduate Center. *Id.* ¶ 522. Dodd responded that she was interested. *Id.* On February 3, 2017, Tien again wrote Dodd, stating that "[i]t is essentially a done deal on our end. . . . It is up to City to release you for the one course, once the formal request is made." *Id.* ¶ 531. The same day, a Graduate Center officer wrote Cronin asking that Dodd teach in the Graduate Center in Fall 2017. *Id.* ¶ 532. Cronin denied the request. He emailed that "it has generally been the policy at City College that we don't release untenured faculty to teach at the Grad Center." *Id.*

On February 8, 2017, Dodd, unaware of Cronin's denial, met with Driscoll, Baptiste, and a member of the Provost's office, informed them of Tien's invitation, noted that teaching at the Graduate Center might improve her tenure application, and received Driscoll's apparent approval to teach at the Graduate Center. Def. 56.1 ¶¶ 114–115; Pl. 56.1 ¶ 537. After Dodd informed Tien of this conversation on February 21, 2017, he forwarded her email to Alyson Cole, the Executive Officer of the Graduate Center's political science program. Pl. 56.1 ¶ 544. Cole wrote back, "[I]'m confused. [H]er chair said no. . . . [I] really don't want to undermine Bruce's

17

clear rejection of this possibility.  [H]e usually says yes, and if he says no, don't you think we

need to respect that?"  *Id.*  On February 22, 2017, Cole emailed Cronin to discuss Dodd's

request.  Cronin gave the same reason as before, stating that "if Lynda wishes [to teach a

Graduate Center class] she will need to talk to me about it first."  *Id.* ¶ 545; Def. 56.1 ¶ 117.

On February 23, 2017, Tien told Dodd about Cronin's rejection.  Dodd asked Tien if he

could instead send the paperwork to Driscoll, who should be overseeing Dodd's course schedule

under the Settlement Agreement.  Pl. 56.1 ¶ 547.  Tien demurred, stating that it was unlikely the

Graduate Center would move forward without the approval of Dodd's chair, *i.e.*, Cronin.  *Id.*  On

February 24, 2017, Dodd wrote to Baptiste and Driscoll seeking advice, and stating that Cronin

should not have been involved under the Settlement Agreement.  *Id.* ¶ 548.  In response, Driscoll

asked Foster, then Interim Dean of the Powell School, to take over responsibility for Dodd's

course scheduling and to review the Graduate Center paperwork.  *Id.*; Def. 56.1 ¶¶ 120, 126.  A

few minutes later, however, Dodd wrote to Driscoll, Foster, and Baptiste that "[i]t appears that it

is too late to add the Grad Center course.  While this was held up, they filled up their fall

schedule."  Def. 56.1 ¶ 122.  Foster, asked at his deposition about his actions after Driscoll

tasked him with managing Dodd's schedule, testified that he did "very little, since seven minutes

later Professor Dodd said it's too late."  *Id.* ¶ 125.  Ultimately, Driscoll and Foster approved Dodd

to teach at the Graduate Center for the fall 2017 semester.  Pl. 56.1 ¶ 577.

### c.     *Delay of Dodd's 2015–2016 evaluation*

Under the Settlement Agreement, Dodd was to receive her 2015–2016 evaluation by

October 31, 2016, at the latest.  *Id.* ¶ 509.  That did not occur.  Initially, to comply with the

Settlement Agreement, Driscoll appointed Judith Stein, a professor in the History Department, to

conduct this evaluation in lieu of Cronin.  Def. 56.1 ¶¶ 135–136.  Stein, an outsider to the

Political Science Department, had several questions about the evaluation, which she directed to

Driscoll in fall 2016. *Id.* ¶ 138; Pl. 56.1 ¶ 137. Around this time, however, President Coico abruptly resigned from her position, and Driscoll was appointed as "Administrator in Charge" of CCNY, while also continuing to serve as Provost. Def. 56.1 ¶ 140–141. Amid these circumstances, Driscoll testified, she may have neglected to respond to Stein. *Id.* ¶ 142. On February 8, 2017, Dodd met with Driscoll and Baptiste, and notified them that her annual evaluation had still not been completed. *Id.* ¶ 143. When Driscoll followed up with Stein, Stein informed her that she would be unable to perform the evaluation. *Id.* ¶ 144. Driscoll later learned that this was because Stein had been diagnosed with terminal cancer. *Id.* ¶ 145.

> d.    *Tartter's evaluation of Dodd and Dodd's ensuing discrimination complaint and union grievance*

Although the October 31, 2016 deadline had long since passed, Driscoll sought a replacement evaluator for Dodd. *Id.* ¶ 146. On March 28, 2017, Driscoll asked Foster to suggest potential evaluators. He identified two: Tartter, a professor in the Psychology Department, and Marilyn Gunner, a physics professor. *Id.* ¶ 147; Pl. 56.1 ¶¶ 147, 557. Foster testified that he suggested Tartter because "she served as dean, has experience evaluating work outside her own field, is smart and has integrity and [is] committed to the mission of the college." Def. 56.1 ¶ 148. Driscoll also testified that they "were interested in having a senior scholar with experience in evaluation . . . . That seemed to me to be the most important criteria that both [Stein and Tartter] would have had experience helping people towards tenure." *Id.* ¶ 149. As the defendants have conceded, one of these understandings was incorrect: as Tartter later testified, she had never conducted an annual evaluation. Pl. 56.1 ¶ 563; *see* Def. Mem. at 25 n.13.

On April 3, 2017, Driscoll advised Dodd that Tartter would be conducting her evaluation. Def. 56.1 ¶ 150. Dodd objected to this, unsuccessfully, on the grounds that the gap between Dodd's and Tartter's fields of study would impede Tartter in assessing Dodd's work. *Id.* ¶ 151;

19

Pl. 56.1 ¶ 151.  Dodd claims that, in the months between Tartter's selection as Dodd's evaluator and Tartter's submission of a final report, Tartter consulted with CCNY counsel Occhiogrosso on the content of that report, which had largely been written before Dodd and Tartter met to conduct Dodd's evaluation.  *See* Pl. 56.1 ¶¶ 563, 570–571.  Evidence suggests that Occhiogrosso did provide feedback on Tartter's review, in light of the CUNY's prior Settlement Agreement with Dodd and the possibility that the evaluation could prompt new discrimination and/or retaliation complaints.  *See, e.g.*, Clark Decl., Ex. 211.

On May 22, 2017, Tartter and Dodd met to conduct Dodd's evaluation.  Def. 56.1 ¶ 153. Thereafter, Tartter produced an evaluation report dated May 29, 2017.  *Id.* ¶ 155.  In it, Tartter wrote that "there appears to have been little progress since previous evaluations that found her output deficient."  *Id.* ¶ 156.  She noted that Dodd has two book manuscripts under contract with Cambridge University Press, including her sole-authored book, *Taming the Rights Revolution*, but that neither were in print and so it was impossible to judge their impact.  *Id.* ¶¶ 157–160. Tartter also recognized that Dodd had published an article in a peer-reviewed journal in 2015, but wrote that the article had already been under review at the time of Dodd's last evaluation in 2014, and so could not be considered "new."  *Id.* ¶ 157.  Concluding, Tartter found "Dodd's research output to be very low for someone of her rank and title," and that Dodd engaged in "a pattern of self-aggrandizement and overstatement of achievement" and had shown an "unwillingness to produce valid evidence or context for assertions."  *Id.* ¶ 161.

Dodd challenges Tartter's qualifications to have reached these conclusions.  She notes that Tartter admitted in her deposition that, although she felt qualified to review Dodd's work in the context in which she was called to do so, she "[did] not consider [herself] qualified to read her book or book chapter and say where it fits in her field."  Def. Reply 56.1 ¶ 616.  Dodd also

notes that, during the evaluation process, Tartter called her brother, an attorney, for context on Dodd's scholarship, including to understand the meaning of certain legal precedents discussed in Dodd's work. *Id.* ¶ 617.

On June 5, 2017, Dodd submitted a memorandum rebutting Tartter's report. Pl. 56.1 ¶ 625. She criticized Tartter for "unprofessional and hostile conduct, her disdain for Dodd's disability, and her inaccurate statements." *Id.* On the same day, Dodd also filed a discrimination complaint against Tartter, attaching the memorandum. *Id.*

The next day, the PSC—the union that represents CUNY's faculty and staff—filed a grievance on Dodd's behalf, seeking the removal of Tartter's evaluation from Dodd's personnel file. *Id.* ¶ 628. As CCNY's labor designee, Occhiogrosso was responsible for hearing this grievance in the first instance, at "Step 1" of the grievance process. Notwithstanding his involvement in addressing Dodd's accommodation requests and in counseling Tartter over the course of her evaluation, Occhiogrosso did not recuse himself from this proceeding. *Id.* ¶ 629. Dodd complains that Occhiogrosso improperly delayed deciding this claim by missing a 15-day deadline, causing Tartter's evaluation to remain in her file throughout her tenure and reappointment review that fall. *Id.* Dodd, however, also admits that it was the PSC that requested all proceedings be suspended from June 2017 until October 20, 2017. Def. Reply 56.1 ¶ 629; *see* Dkt 111 ("Pl. Opp'n") at 34 ("The union did request a standard 'stop-the-clock' during the summer."). After Dodd's grievance proceeded to Step 2, the CUNY Chancellor's designee denied it in its entirety. Def. 56.1 ¶¶ 204–208.

On April 24, 2018, Baptiste notified Dodd that "the discrimination complaint that you filed against Vivien Tartter has been closed due to [Dodd's] filing," in December 2017, the initial complaint in this lawsuit, which was "based on the same allegations." Joint Ex. 93.

###### e.     Changes to the Skadden Program

On November 1, 2017, Foster emailed Dodd notifying her that the "Skadden Arps law firm has informed us that it does not intend to continue its same level of support for the CCNY [Skadden Program]."  Def. 56.1 ¶ 132.  In addition, Foster told Dodd, "the Flom Professorship will not be supported beyond the initial ten-year grant period—that is, after the 2018–2019 academic year—and therefore will cease to exist.  I appreciate that these developments will affect you, but they are beyond our control."  *Id.* ¶ 133.  The parties dispute the impetus for this decision.  Dodd claims that Skadden was influenced by Boudreau's recommendation to eliminate the position.  Defendants argue that Skadden independently had decided to eliminate the position, as a cost-saving measure.  *See* Pl. 56.1 ¶¶ 128–134.  A 2015 memorandum from a Skadden partner involved with the program stated:  "Over time, we have concluded that the dedication of a CCNY Professorship to the Program is an unjustifiable expense.  We believe that Program funds can more effectively be used for other student-related efforts."  Def. 56.1 ¶ 129.

###### f.     CCNY's denial of Dodd's request for back pay

On a date the summary judgment record leaves unclear, the PSC and CUNY entered into a new CBA that included a salary increase for junior faculty.  Pl. 56.1 ¶ 538.  As a result, Dodd received a retroactive raise in her base, associate-professor salary.  *Id.* ¶¶ 528, 538.  But she did not receive any corresponding retroactive raise for her supplemental salary associated with the Flom Professorship, which represented one-third of her base salary.  *Id.*  After raising the issue, Dodd apparently received some back pay in connection with her supplemental salary, *see id.* ¶ 538, but she was denied an additional amount under CUNY's interpretation of the CBA, *see id.* ¶¶ 237, 716.

### 7.     Dodd's Application for Early Tenure

Under the Settlement Agreement, Dodd was given two extra years to achieve tenure. Def. 56.1 ¶¶ 162–163. Whereas she originally would have come up for tenure review in fall 2017, under the Agreement she had until fall 2019 to apply. *See id.* The Agreement, however, did not preclude her from applying for early tenure. *Id.*; *see* Settlement Agreement § 5. And, on April 11, 2017, Dodd informed Foster that she wished to do so in fall 2017—the point when, absent the Settlement Agreement, she would have been required to apply for tenure.[4] Def. 56.1 ¶ 165. Foster replied to Dodd that "since you are applying . . . for early tenure, CUNY's standards are higher than for regular tenure decisions." *Id.* ¶ 166.

On June 15, 2017, Driscoll wrote to Dodd, "[t]o the extent you are questioning whether your applying for tenure at this point is considered 'early tenure,' the unequivocal answer is that it is. The settlement agreement dated June 8, 2016 . . . leaves no doubt about this point." *Id.* ¶ 167; *see* Settlement Agreement § 2 ("The PSC and Professor Dodd hereby waive any claim to tenure based upon Professor Dodd's reappointment for and service during the 2016–2017 and 2017–2018 academic years.").

#### a.     *Krinsky's actions as chair for Dodd's tenure application*

In May 2017, Driscoll appointed Krinsky, in lieu of Cronin, to serve as Department chair for purposes of overseeing Dodd's tenure process. Def. 56.1 ¶ 168. In that role, Krinsky was responsible for soliciting evaluators, or "referees," from other academic institutions, who would

---

[4] Dodd maintains that the primary reason she forwent the two-year accommodation she had previously fought to obtain, and instead applied for tenure earlier than she had to, was her belief "that she met the criteria for tenure." Pl. 56.1 ¶ 529; *see* Pl. Opp'n at 23. However, she also states that she feared CUNY would deny her reappointment at its first opportunity to do so after the Settlement Agreement, and "thought that defendants would have difficulty justifying non-reappointment if outside scholars had evaluated [her] scholarship" through the tenure-review process." Dodd Decl. ¶ 28.

provide evaluations for Dodd's tenure review. *Id.* ¶ 169. In connection with that solicitation, Krinsky and Dodd engaged in various negotiations as to the timing, content, and format of the solicitation package that would go out. He was also responsible for arranging the Tenure Committee's votes on her application, and for producing a "Chair's Report" explaining the Tenure Committee's decision to the higher committees. *Id.* ¶¶ 169, 183.

Dodd has alleged that a number of acts that Krinsky took in that capacity were retaliatory.

First, on May 22, 2017, after Dodd sought until late July 2017 to submit materials for the solicitation package that would be sent to potential referees, Krinsky reluctantly agreed to her proposed schedule. Pl. 56.1 ¶ 611. But, on June 10, 2017, he reversed course and demanded that Dodd provide her materials for the solicitation package on a much shorter timeline. *Id.* ¶¶ 638, 643; Def. Reply 56.1 ¶ 638. Dodd alleges that this shift prevented her from updating her candidate statement. Pl. 56.1 ¶ 643. In an email justifying this decision, Krinsky stated that he had come to understand that the late-July schedule created a "fundamental conflict" with the tenure-review schedule suggested by CCNY policy, which called for a longer review period for referees. Clarke Decl., Ex. 271 at 2. He also opposed notifying referees in June with a "save the date" email, before giving them the package of materials to review in late July, because that would signal that Dodd was "scrambling." *Id.* Dodd, on the other hand, notes that Krinsky's reversal occurred shortly after Dodd filed a disability-discrimination complaint against Tartter and challenged Tartter's negative evaluation on June 5 and 6, 2017. Pl. Opp'n at 35. She also notes that Occhiogrosso, who was aware of Dodd's complaints against Tartter, advised Krinsky to adhere to the earlier schedule. *See* Pl. 56.1 ¶ 639. Ultimately, Krinsky began to solicit referees by June 16, 2017, but agreed to send updates to the referees later in the process. *Id.* ¶¶ 656, 661.

Second, Krinsky made changes to Dodd's *curriculum vitae* ("CV").  On May 17, 2017, Krinsky wrote to Dodd regarding the books identified in her CV.  *Id.* ¶ 594.  He notified her that, under CCNY policy, only books that had been published or "accepted for publication" could be listed as books in her CV.  *Id.*  He asked for documentation confirming that the two books identified in her CV had in fact been accepted for publication.  *Id.*  There was some uncertainty about the status of Dodd's forthcoming sole-authored book, *Taming the Rights Revolution*, which was expected to be accepted in summer 2017.  Clark Decl., Ex. 295.  As a result, on June 14, 2017, Krinsky suggested listing the work as "forthcoming" in the initial solicitation package, but promised to send out an updated CV once it became accepted.  *Id.*; *see* Pl. 56.1 ¶ 656.  On June 17, 2017, after a back-and-forth regarding the status of this book, Dodd agreed to "leave it up to [Krinsky] how [he] interpret[s] where the entry should go on the CCNY format CV right now" and that she was "fine either way."  Krinsky Decl., Ex. F at 2–3.  Krinsky responded that he had moved the book to "works forthcoming or under review"; Dodd thanked him for letting her know.  *Id.* at 1.  On August 2, 2017, Dodd received confirmation from Cambridge University Press that *Taming the Rights Revolution* had been accepted and would be published in the fall, which she forwarded to Krinsky.  *Id.*, Ex. G at 2.

Ultimately, however, Krinsky never sent out an updated CV.  Pl. 56.1 ¶ 656.  Instead, he added the acceptance note and revised book manuscript to the online folder that was available to the referees, and emailed the referees to explain the situation, while leaving the CV unrevised.  *Id.* ¶¶ 181, 656.  Krinsky has testified that he chose this course because he had come to understand that CCNY policy required Dodd's CV to be the same at each stage of the review process.  *See* Krinsky Decl. ¶ 24; Def. 56.1 ¶ 181; Def. Reply 56.1 ¶ 656.

Third, Krinsky drafted the solicitation letter that went out to referees in a way Dodd disapproved.  The letter, which Dodd claims reflected input from Occhiogrosso, contained language absent from CCNY's sample solicitation letter and from letters (past and future) sent regarding other candidates.  Pl. 56.1 ¶ 652.  The letter also omitted language Dodd contends was favorable to her and which was included in later letters for other candidates.  *Id.* ¶ 653.  Specifically, Krinsky inserted into the solicitation letter language noting CUNY and CCNY's policy that early tenure may be awarded in "exceptional cases," when an "extraordinary reason" or "very substantial reason" indicates that the school would be well-served by such a grant of tenure.  *Id.* ¶ 652.  Krinsky also, after consulting with Menon and another political science professor, omitted language stating that "[i]n Professor Dodd's case, early tenure may be warranted because of her outstanding scholarship," which those professors indicated could be read to suggest, inadvertently, that the Department viewed early tenure as warranted.  *Id.* ¶ 653.

Finally, on December 9, 2017, after the Tenure Committee voted against recommending Dodd for tenure, Krinsky issued a "Chair's Report" on her application.  Def. 56.1 ¶ 183.  The report explained the Tenure Committee's decision, writing that Dodd had a "very well-placed, but fairly thin publication record," that the unpublished status of her books made it impossible to judge the "impact on the discipline of her main research projects," and that her publication record was no more exceptional than that of many of her colleagues.  *Id.* ¶¶ 184–187.  Ultimately, Krinsky's Chair's Report concluded that Dodd's application did not present an "exceptional record" or "substantial reason" justifying the award of early tenure.  *Id.* ¶ 188.  Dodd claims that this report also (1) imposed a higher bar than set by CUNY's, CCNY's, or the Political Science Department's early-tenure standards; (2) described Dodd's referee evaluations unduly negatively; (3) criticized Dodd's earlier appeals of denials of her reappointments; and (4)

unfairly criticized her for lack of collegiality by describing her as an "*exceptionally* difficult colleague."  *See* Pl. Opp'n at 36–37 (quoting Joint Ex. 82 ("Chair's Report") at 4 (emphasis in original)).

### b.   *Votes on Dodd's tenure application*

On May 19, 2017, the Tenure Committee held its first screening vote for Dodd's early-tenure application.  Def. 56.1 ¶ 211.  The attendees were DiSalvo, Baver, Menon, and Krinsky.  *Id.*  The Committee voted against recommending Dodd for early tenure.  *Id.*  Dodd maintains that the Committee wrongly applied a heightened early-tenure standard.  *See* Pl. 56.1 ¶¶ 211, 605–617.

On October 4, 2017, the same Committee held a second screening vote.  The same four professors voted again not to recommend Dodd for early tenure.  Def. 56.1 ¶ 212.

The next day, on October 5, 2017, Dodd's counsel informed CUNY that Dodd intended to file a lawsuit, likely the next week.  *Id.* ¶ 677; Clark Decl., Ex. 318.

Dodd also complained to Foster that Krinsky had failed to update Dodd's CV to reflect Cambridge University Press's acceptance of *Taming the Rights Revolution*.  Def. 56.1 ¶ 213.  Foster then remanded the decision to the Tenure Committee so that the Committee could hold another vote, based on an updated version of Dodd's CV.  *Id.*  On November 2, 2017, the Tenure Committee conducted, anew, the second screening vote.  It again voted against recommending Dodd for tenure.  *Id.* ¶ 214.  Dodd appealed.  *Id.* ¶ 215.

On December 19, 2017, the P&B Committee met to consider Dodd's application.  *Id.* ¶ 216.  The four voting members were professors Marta Bengoa, Robert Melara, Maritsa Poros, and Irina Silber.  Foster attended but did not vote.  *Id.*  At the meeting, the P&B Committee unanimously voted in favor of Dodd's application for early tenure.  *Id.*

On January 13, 2018, Charles Epp, a professor at the University of Kansas, sent a letter to Boudreau, stating that it was on behalf of himself and 49 other scholars, supporting Dodd's tenure application and condemning the denial votes as a "manifest injustice." Pl. 56.1 ¶ 712.

On February 7, 2018, the Review Committee met to consider Dodd's application. *Id.* ¶ 217. The voting members at this meeting included Driscoll, Foster, and seven other deans of CCNY colleges. *Id.* One other dean, as well as Menon, were also on the Review Committee but were absent from this meeting. *Id.* ¶ 218. Dodd notes that, by this point, Driscoll and Foster had been named as defendants in the instant lawsuit, which she had filed in December 2017. Pl. 56.1 ¶ 217. At the meeting, Foster presented on Dodd's tenure application and urged the Committee to follow the Department's, not the P&B Committee's, vote, and to deny Dodd tenure. *Id.* ¶ 717. In support, he argued that the P&B Committee "was probably not as well informed as it ought to have been" given the lack of a "voice" from the Political Science Department during its review. *Id.* Dodd notes, however, that the P&B Committee had in fact received Krinsky's Chair's Report explaining the Department's decision. *Id.* The Review Committee voted not to grant Dodd early tenure. Def. 56.1 ¶ 219. Dodd appealed this decision to Boudreau. *Id.* ¶ 220.

On April 2, 2018, Boudreau, who years earlier had suggested that he would likely recuse himself from personnel decisions involving Dodd, *see* Pl. 56.1 ¶ 459, reviewed Dodd's appeal and rejected it, Def. 56.1 ¶ 221. That denial ended Dodd's bid for tenure.

### 8.    Dodd's Reappointment for 2018–2019

Dodd was not subject to reappointment votes for 2016–2017 and 2017–2018 because the Settlement Agreement provided for her reappointment for those years. *See* Settlement Agreement § 2. However, as Dodd's tenure application proceeded through the review process, the issue whether she was to be reappointed as an associate professor for the 2018–2019 academic year

was up for review, and subject to a series of votes.  This was Dodd's first reappointment review since 2015.  Def. 56.1 ¶ 222.

On October 16, 2017, the Executive Committee met to consider Dodd's reappointment for 2018–2019.  *Id.*  Pursuant to the Settlement Agreement, Professor Robert Melara replaced Cronin as chair of this meeting.  *Id.* ¶ 222.  The other voting attendees were DiSalvo, Menon, Baver, and Krinsky.  *Id.* ¶ 223.  The Executive Committee voted in favor of Dodd's reappointment for 2018–2019.  *Id.* ¶ 224.

On November 7, 2017, the P&B Committee, again composed of Bengoa, Melara, Poros, and Silber, met to consider Dodd's reappointment.  *Id.* ¶ 225.  The Committee also voted in favor of Dodd's reappointment.  *Id.* ¶ 226.

On November 29, 2017, the Review Committee met to consider Dodd's reappointment.  *Id.* ¶ 227.  As in the context of Dodd's tenure application, the Committee included Foster, Driscoll, eight CCNY deans, and Menon.  *Id.*  But at this meeting, Driscoll and Menon were absent.  *Id.* ¶ 228.  The Committee voted not to reappoint Dodd for the 2018–2019 academic year.  *Id.* ¶ 229.  Of those present, eight members, including Foster, voted "no" and one member voted to abstain.  *Id.* ¶¶ 229–230.  Dodd appealed this decision to President Boudreau.  *Id.* ¶ 231.

On February 1, 2018, Boudreau remanded the matter to the Review Committee because, as in other recent cases, the Committee had not been presented with Dodd's entire review file at the time of its vote.  *Id.* ¶ 232.  As a result, on February 7, 2018, the Review Committee met again to reconsider its vote on Dodd's reappointment—the same meeting at which it considered Dodd's tenure application.  *Id.* ¶ 233–234; Pl. 56.1 ¶ 232.  At this meeting, the Review Committee voted against Dodd's reappointment.  Five members voted in favor of Dodd's reappointment, and four voted against it; Menon and another professor, as noted, were absent.  Def. 56.1 ¶ 235.

However, because reappointment votes require a majority of the entire committee, not just of those present, Dodd fell one vote short of the requisite six out of 11 "yes" votes necessary for her reappointment.  *Id.* ¶ 236.

On April 19, 2018, Boudreau denied Dodd's appeal with respect to her reappointment. Pl. 56.1 ¶ 734.  The next day, Dodd requested that Boudreau provide her with a statement of reasons for his denial.  Def. 56.1 ¶ 238.

On May 3, 2018, Boudreau sent Dodd his statement.  *Id.* ¶ 239.  In it, Boudreau cited Dodd's lack of scholarly productivity as the primary reason for his decision.  First, he noted, Dodd's only sole-authored book, *Taming the Rights Revolution*, had been on her CV since she was hired in 2010 and still had not been published.  *Id.* ¶ 240.  Second, he discounted Dodd's edited volume, *The Rights Revolution Revisited*, and the three chapters she had contributed to it, as "entitled to very little weight as scholarship in the context of consideration for reappointment, as you were consistently advised in evaluations and as reflected in the Political Science Department's tenure guidelines dated October 2012."  *Id.* ¶ 242.  Finally, he noted that, since joining CCNY, Dodd had published only one article in a peer-edited journal.  *Id.* ¶ 243.  Dodd argues that this statement failed to take into account her tenure referees' positive accounts of her scholarship and the 50-scholar letter described above.  Pl. 56.1 ¶ 240.

As a result of the Review Committee's decision and Boudreau's denial of Dodd's appeal, August 31, 2018, was Dodd's last day of employment at CUNY.  *Id.* ¶ 749.

### B.    Procedural History

Dodd commenced this action on December 20, 2017, at a point when CUNY was in the midst of considering whether to grant her early tenure and reappointment.  Dkt. 1.  Her original Complaint alleged that, after her MS diagnosis, CUNY and various individual defendants had subjected Dodd's tenure review to special procedures and heightened standards, responded to her

requests for reasonable accommodations with "hostility and obstruction," breached the Settlement Agreement via various retaliatory acts, and that various defendants had voted against her tenure application and reappointment. *Id.* ¶ 2. Although the Review Committee had yet to take its final votes—which came on February 7, 2018—to deny early tenure and reappointment, and Boudreau had not yet denied her ensuing appeals, Dodd's Complaint alleged that the negative committee votes that had already been lodged were retaliatory. *Id.* ¶¶ 2, 110.

After Dodd, on March 28, 2018, filed an Amended Complaint, Dkt. 17 ("FAC"), defendants moved to dismiss, Dkt. 21. Dodd opposed, and cross-moved for leave to file a second amended complaint. Dkt. 24. On September 7, 2018, the Court denied the motion to dismiss and granted in part Dodd's cross-motion for leave to amend. *Dodd v. CUNY*, No. 17 Civ. 9932 (PAE), 2018 WL 4284289, at *1 (S.D.N.Y. Sept. 7, 2018). The Court held that Dodd's FAC pled sufficient facts to plausibly allege retaliation under the Rehabilitation Act, *id.* at *6–9; held that the claims against the individual defendants under the NYSHRL and NYCHRL survived because Boudreau qualified as an "employer" under those laws and the other individual defendants could be held liable as aiders and abettors, *id.* at *9; and granted leave to add claims alleging retaliation that occurred after the filing of the FAC and an ADA claim against Boudreau, which had become available as Dodd had by then exhausted administrative remedies, *id.* at *10.

On September 11, 2018, Dodd filed the presently operative second amended complaint, Dkt. 39 ("SAC"), which the defendants answered on October 16, 2018, Dkt. 45.

After the close of discovery, on July 12, 2019, the Court held a pre-motion conference regarding defendants' contemplated motion for summary judgment. On August 9, 2019, the parties filed their joint statement of stipulated facts. JSF. On October 8, 2019, defendants filed a

31

motion for summary judgment, Dkt. 97; a memorandum of law in support, Dkt. 98 ("Def.

Mem."); various declarations in support, Dkts. 101–106; and a Local Rule 56.1 statement,

Def. 56.1.  On November 11, 2019, Dodd opposed the motion for summary judgment, Pl. Opp'n,

and filed a series of declarations in support of her opposition, Dkts. 113–120, as well as a Local

Rule 56.1 counter-statement, Pl. 56.1.  On January 24, 2020, the defendants filed their reply, Dkt.

129 ("Def. Reply"), further declarations in support, Dkts. 129–31, and a reply to Dodd's Local

Rule 56.1 counter-statement, Def. Reply 56.1.  On August 5, 2020, Dodd filed a supplemental

letter, to which the defendants responded on August 7, 2020.

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears the burden of demonstrating the absence of a question of material fact.  In

making this determination, the Court must view all facts "in the light most favorable" to the

non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); *see Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 370 (S.D.N.Y. 2013). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less" to retaliation claims. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in such cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). And courts may grant summary judgment against such "claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III.   Discussion

Defendants move for summary judgment on all of Dodd's claims. The Court first considers Dodd's claim that CUNY, in denying her both tenure and reappointment, retaliated against her in violation of the Rehabilitation Act; then her retaliation claim against Boudreau under the ADA; and finally, her NYSHRL and NYCHRL claims against the individual defendants.

### A.   Dodd's Retaliation Claim Against CUNY Under the Rehabilitation Act

Dodd claims that CUNY, in denying her tenure and reappointment in 2018, retaliated against her in response for the various charges she had made of disability discrimination and retaliation arising from her complaints that CUNY was failing to reasonably accommodate her MS, as well as for initiating the instant action arising from the same.

### 1.   Applicable Legal Standards

The Rehabilitation Act prohibits "any program or activity receiving Federal financial assistance" from discriminating against an employee "solely by reason of her or his disability." 29 U.S.C. § 794(a).  Like many other federal anti-discrimination provisions, the Rehabilitation Act also prohibits retaliation against a person for opposing any practice made unlawful by the Act.  *See* 29 U.S.C. § 794(d); 29 C.F.R. § 1614.01(b).

Claims for retaliation under the Rehabilitation Act are analyzed under the familiar "*McDonnell Douglas*" burden-shifting framework established for analyzing Title VII, and other, retaliation claims.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  At the first step of this analysis, the plaintiff bears the burden of making out a *prima facie* case of retaliation.  *Id.*  To do so, she must establish by a preponderance of the evidence that (1) she engaged in an activity protected by the Rehabilitation Act; (2) the employer was aware of that activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.  *See Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002).  "A plaintiff's burden at this prima facie stage is *de minimis*."  *Treglia*, 313 F.3d at 719.  But she cannot meet it with "purely conclusory allegations . . . , absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

As to the first element, a protected activity is an "action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local L. No. 85). "An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011). The clearest example of such activity is the filing of a lawsuit alleging unlawful discrimination. But protected activity also extends to more "informal protests of discriminatory employment practices," such as "making complaints to" superiors, "writing critical letters," "protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

As to the second element, at the *prima facie* stage, an employee need only show "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

As to the third element, an adverse employment action occurs when "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citation omitted). This standard is "broader than the adverse employment action requirement in the . . . discrimination context, because the action in question need not affect the terms and conditions of employment in order to be considered adverse." *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 388 (S.D.N.Y. 2011). In this District, that standard is broad enough to encompass negative employment evaluations. *See, e.g.*, *United States v. N.Y.C. Dep't of Educ.*,

407 F. Supp. 3d 365, 407 (S.D.N.Y. 2018) ("Negative evaluations may be considered adverse where the evaluation negatively impacted plaintiff's employment, although whether they do is typically a question of fact for the jury." (citation omitted)).  And, although "normally petty slights, minor annoyances, and simple lack of good manners will not" suffice, "[c]ontext matters." *White*, 548 U.S. at 68–69.  "Something might be a 'petty slight' to one person but 'matter enormously' to another, such that it could 'deter a reasonable employee from complaining about discrimination.'" *Massaro v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 774 F. App'x 18, 22 (2d Cir. 2019) (summary order) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)).

Finally, as to the fourth element, causation may be proven "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Hicks*, 593 F.3d at 170 (quoting *Gordon*, 232 F.3d at 117).  Direct evidence is "evidence tending to show, without resort to inference, the existence of a fact in question." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992).  Indirect evidence may consist of temporal proximity or other circumstantial evidence.  *See Hicks*, 593 F.3d at 170; *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).  The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001).  But the Supreme Court has suggested that the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (citation omitted).  Generally, to show causation through temporal proximity alone,

courts in this Circuit require no more than two months to have passed between a protected

activity and an adverse action. *See, e.g.*, *Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE),

2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases).

If a plaintiff meets her burden at the first step of this analysis by establishing each of the

four elements of the *prima facie* case, "a presumption arises that more likely than not the adverse

conduct was based on the consideration of impermissible factors." *Vega*, 801 F.3d at 83. At that

point, the burden of production shifts to the defendant, who must "articulate a legitimate, non-

retaliatory reason for the challenged employment decision." *Treglia*, 313 F.3d at 721. The

defendant's burden at this stage is "one of production, not persuasion." *Reeves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133, 142 (2000)

And if the defendant meets its burden at step two, then, at the final step of the *McDonnell*

*Douglas* analysis, the presumption of retaliation drops away and "the plaintiff must point to

evidence that would be sufficient to permit a rational factfinder to conclude that the employer's

explanation is merely a pretext for impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205,

216 (2d Cir. 2001). At the summary judgment stage, this requires the plaintiff to identify

evidence sufficient to allow a rational factfinder to conclude "that the desire to retaliate," not the

employer's proffered justification, "was the but-for cause of the challenged employment action."

*Ya-Chen Chen v. CUNY*, 805 F.3d 59, 70 (2d Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v.*

*Nassar*, 570 U.S. 338, 352 (2013)); *see Natofsky*, 921 F.3d at 349–53 (applying but-for causation

standard to discrimination and retaliation claims under the ADA and Rehabilitation Act). "But-

for" causation does not require a showing that retaliation was an employer's sole motive, only

that "the adverse action would not have occurred in the absence of the retaliatory motive." *Zann*

*Kwan*, 737 F.3d at 846. A plaintiff may show but-for causation by "demonstrating weaknesses,

implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.*

These principles apply to claims arising in the context of a university's tenure and reappointment decisions. To be sure, as the Second Circuit has recognized, "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir. 1984) (citing *Lieberman v. Gant*, 630 F.2d 60, 64 (2d Cir. 1980)). Those special factors include the substantial commitment a grant of tenure entails, the non-competitive nature of the application process, the decentralized nature of the decision-making process, the nuance of the assessments that must be made, and the strong disagreements that often attend the ultimate decisions. *Id.* at 92–93. Nonetheless, "[t]enure decisions are not exempt" from anti-discrimination and anti-retaliation laws, and "plaintiffs seeking to show that forbidden purposes lurk in a tenure decision have available methods of challenging such decisions." *Id.* at 93. Areas of proof that may suggest retaliatory denial of tenure and be sufficient to justify denial of summary judgment on such claims include "[d]epartures from procedural regularity," which "can raise a question as to the good faith of the process where the departure may reasonably affect the decision," and "[c]onventional evidence of bias on the part of individuals." *Id.*; *see id.* at 93–94 ("Given the elusive nature of tenure decisions, we believe that a prima facie case that a member of a protected class is qualified for tenure is made out by a showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question."); *see also Stern v. Tr. of Columbia Univ. in the City of N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997); *see also, e.g.*, *Whaley v. CUNY*, 555 F. Supp. 2d 381, 407 (S.D.N.Y. 2008); *Hinton v. CCNY*, No. 05 Civ. 8951 (GEL), 2008 WL 591802, at *18, 26–27 (S.D.N.Y. Feb. 29, 2008).

### 2.      Denial of Tenure

CUNY moves first for summary judgment on Dodd's claim that its denial of her tenure application was a result of retaliation for the series of disability discrimination and retaliation complaints that she had filed against CUNY officials beginning in 2015.  Most closely proximate to the tenure decision, Dodd claims that her filing of the complaint against Tartter in June 2017 led Krinsky—then overseeing her application for tenure—to take retaliatory actions which impaired that application.  Pl. Opp'n at 17.  Dodd further contends that her notification to CUNY in October 2017 that she intended to sue the university and her filing of the initial Complaint in this action in December 2017 contributed to the Review Committee's February 2018 decisions, confirmed by Boudreau, to deny her tenure and reappointment.  *Id.* at 10–11.  Dodd argues, too, that these decisions presented the first opportunity that the Review Committee and Boudreau had to strike back at her since the complaints she had made about the failure to accommodate her disability that culminated in the 2016 Settlement Agreement, and that a jury could fairly view the denial of her tenure application as retaliation for that earlier protected activity.  *Id.* at 11, 23.

CUNY counters that the evidence adduced in discovery does not show a causal connection between any protected activity and its denial of tenure and reappointment, and therefore falls short of a *prima facie* case of discrimination.  And, it argues, even if Dodd clears this first hurdle, given the long-running and widely articulated critiques within CUNY of Dodd's scholarship as quantitatively deficient, she cannot show that CUNY's legitimate and non-retaliatory reasons for denying her tenure are merely pretext.  For the following reasons, the Court finds the evidence sufficient to permit a reasonable jury to hold for Dodd on this claim, and accordingly denies CUNY's motion for summary judgment.

*a.*     Prima facie *case*

As to the *prima facie* case, CUNY disputes only whether the evidence is sufficient to support a causal connection between protected activity on Dodd's part and the denial of her tenure application.  Def. Mem. at 4–5.  CUNY recognizes that the Review Committee's February 7, 2018 denial of Dodd's tenure application fell within two months of Dodd's filing this action on December 20, 2017.  But it argues that this temporal proximity should be disregarded because, on December 19, 2017, Dodd told a colleague that she expected a negative vote from the Review Committee.  Dodd, CUNY argues, thus "manufactured" temporal proximity by filing her complaint the next day.  Def. Mem. at 4–5 (citing *McFadden v. State Univ. of N.Y., Coll. at Brockport*, 195 F. Supp. 2d 436, 455 (W.D.N.Y. Mar. 28, 2002)).

Whatever the merits of this argument might be before a jury, the close proximity of events cannot be discounted at the summary judgment stage as support for an inference of retaliation—as CUNY's abandonment of this argument in its reply may suggest.  To begin, there is evidence undermining CUNY's thesis that Dodd "manufactured" temporal proximity.  It reflects that Dodd's attorneys notified CUNY of their intent to file this action two months before Dodd's statement to her colleague in December 2017.  Pl. 56.1 ¶ 677.  That notification, in October 2017, came after the Department's initial negative "screening votes," but well before Dodd expressed pessimism about the P&B Committee or Review Committee votes.  *Id.*  And in fact, afterwards, in December 2017, the P&B Committee voted to grant Dodd tenure.  Def. 56.1 ¶ 216.  Thus, unlike in *McFadden*, the lone case on which CUNY relies in its bid to discount Dodd's protected activity as manufactured, Dodd engaged in protected activity long before it became clear she would be denied tenure.  *See McFadden*, 195 F. Supp. 2d at 455.  CUNY does not argue, or point to evidence suggesting, that Dodd's earlier protected activity was undertaken to manufacture temporal proximity for use in a later lawsuit.  *Id.*  Moreover, even though four

months passed between Dodd's notification of the coming lawsuit and the Review Committee's final vote on her tenure application, the Review Committee lacked an earlier opportunity to take adverse action against her tenure application. *See, e.g.*, *Whaley*, 555 F. Supp. 2d at 406. A jury could credit Dodd's argument that, as a result of the Settlement Agreement, the 2017–2018 tenure vote presented the first opportunity for CUNY to take adverse action against her. *See id.* For purposes of the *prima facie* case, the sequence and timing of events would permit—though certainly not require—a jury to find retaliatory animus.

In any event, Dodd may—and does—point to other forms of circumstantial evidence, besides temporal proximity, as a basis to link CUNY's adverse actions to her protected activity. *See Hicks*, 593 F.3d at 170. This evidence is reviewed below in connection with Dodd's argument that CUNY's basis for denying her tenure—that her scholarship was inadequate—was a pretext to cover retaliatory animus. *See infra* pp. 46–63; *see also* Pl. Opp'n at 10–11, 12–23. "[V]iewed holistically," this evidence permits an inference sufficient to establish, at the *prima facie* stage, that the denial was retaliatory. *Dodd*, 2018 WL 4284289, at *7.

        *b.*      *Legitimate and non-retaliatory reasons*

At the second step of the *McDonnell Douglas* inquiry, CUNY must articulate a "legitimate, non-retaliatory reason for the challenged employment decision." *Treglia*, 313 F.3d at 721. CUNY has adduced ample evidence to this effect. It notes that Dodd's application was treated as one for early, rather than regular, tenure. And it points to evidence—including the contemporaneous assessments of many participants in the tenure-review process—that Dodd's body of scholarship fell short of the standards for early tenure. "In tenure and reappointment cases," it is well established that "deficient scholarship is a legitimate, non-discriminatory reason to deny reappointment and/or tenure." *Whaley*, 555 F. Supp. 2d at 406 (citing *Lieberman*, 630 F.2d at 65) (collecting cases); *see Weinstock*, 224 F.3d at 46. Evidence to this effect

41

therefore supplies a legitimate and non-retaliatory reason sufficient to meet CUNY's burden at this step of the analysis.

In brief, as reviewed above, various guidelines and governing documents at CUNY support that early tenure is reserved for exceptional or extraordinary cases. *See, e.g.*, Def. 56.1 ¶ 32. And various CUNY officials responsible for the tenure-review process attested that they understood an early tenure bid to entail a heightened standard. *See* Def. Mem. at 6; Def. Reply at 6. These persons testified that very few faculty members received early tenure. *See, e.g.*, Lawson Decl., Ex. C ("Menon Tr.") at 223 ("[E]arly tenure in my long experience is a very rare thing."). And while Dodd contends that the governing standards for early tenure tracked those for regular tenure, the evidence would permit a finder of fact to conclude otherwise. Indeed, Dodd, whose tenure application was universally understood to be one for early tenure, was expressly notified that a higher standard would apply. In Foster's response to Dodd's April 2017 message stating that she intended to apply for tenure that year, Foster wrote, "since you are applying . . . for early tenure, CUNY's standards are higher than for regular tenure." Def. 56.1 ¶ 166. Nonetheless, as the parties have stipulated, in response "Professor Dodd confirmed that she wished to apply for early tenure." JSF ¶ 93. Later that summer, Driscoll wrote to Dodd explaining, "[t]o the extent you are questioning whether your applying for tenure at this point is considered 'early tenure,' the unequivocal answer is that it is. The settlement agreement dated June 8, 2016 . . . leaves no doubt about this point." Def. 56.1 ¶ 167 (omission in original); *see* Settlement Agreement § 2 ("The PSC and Professor Dodd hereby waive any claim to tenure based upon Professor Dodd's reappointment for and service during the 2016–2017 and 2017–2018 academic years.").

CUNY has, further, adduced formidable evidence that Dodd's tenure application was denied because her scholarship was inadequate to meet the early tenure standard.  Numerous participants in the review process voted against early tenure on the basis that Dodd's scholarship was inadequate, including the four members of the Tenure Committee in its first screening vote (May 2017), its second screening vote (October 2017), and its reprise of the second screening vote (November 2017); and members of the Review Committee in its vote (February 2018).  These bodies included non-defendants in this case.  *See id.* ¶¶ 211–212, 214, 217–218.  The participants in this process testified uniformly that Dodd's insufficient scholarly record was the reason for their votes against awarding early tenure.  *See* Def. Mem. at 7–8 (summarizing testimony from members of each committee).  Contemporaneous documentary evidence is corroborative, including Krinsky's Chair's Report discussing the Tenure Committee's decision, and Boudreau's later Statement of Reasons for his decision to deny Dodd reappointment.  *See* Def. 56.1 ¶ 183–188, 238–242.

For the most part, Dodd—while noting that some participants in the review process supported her bid, including the P&B Committee in its December 2017 vote—does not dispute that CUNY has adduced evidence sufficient to supply legitimate and non-retaliatory reasons for its decision not to grant her tenure.  Her principal argument is that those reasons, even if recorded contemporaneously, were pretextual—a cover story to camouflage CUNY's officials' distaste towards her arising from her series of complaints about CUNY's failure to accommodate her MS disability.  However, at this step, Dodd does take issue with two of CUNY's arguments.

First, to the extent CUNY relies on its dissatisfaction with her "pace of research" as a basis for denying her tenure, Dodd argues that such rationale categorically is not "legitimate."  Pl. Opp'n at 15.  That is because, she argues, her disability inherently constrained the pace of her

research.  *Id.* (citing *McMillan v. City of New York*, 711 F.3d 120, 129 (2d Cir. 2013) (forgoing

pretext analysis because employer's justification for disciplining employee was tardiness caused

by employee's disability)).  That argument is indeed available to Dodd to make to the jury at trial,

but it does not assist Dodd on summary judgment.  Although Dodd's illness was undeniably

serious, a jury could reasonably conclude, with CUNY, that Dodd's pace of research presented a

legitimate basis on which to deny her early tenure.  Critically, this case entails a claim only of

retaliation, not discrimination; it is thus unlike *McMillan*, on which Dodd relies.  *See McMillan*,

711 F.3d at 129.  The question for the jury on this point will be whether CUNY took its adverse

action because of Dodd's protected activities, not because of her disability.  In that context, a

jury could credit the CUNY decision-makers that, harboring no retaliatory animus, they

reasonably viewed Dodd's scholarship as too meager.  Moreover, also unlike in *McMillan*, here

CUNY undisputedly granted Dodd an accommodation related to the pace of her scholarship.

Under § 1 of the Settlement Agreement, Dodd received two extra years to apply for tenure.  As

CUNY notes, it was her choice to forgo this accommodation by applying for tenure two years

earlier than the deadline set in the Settlement Agreement.  Finally, Dodd's argument is

problematic in that, taken to its logical extreme, it would require CUNY to eliminate a core

qualification for tenure (the pace of her scholarship) from consideration in the tenure process.  In

her briefing, Dodd nowhere else takes the view that her scholarly productivity was not fair game

for consideration.

Second, Dodd appears to argue that the Court, at this step, cannot consider her waiver in

the 2016 Settlement Agreement of "any claim to tenure based upon Professor Dodd's

reappointment for and service during the 2016–2017 and 2017–2018 academic years" as

evidence that her application was one for early, not regular, tenure.  Pl. Opp'n at 14.  She argues

that, by citing the Settlement Agreement as its reason for treating her application as one for early tenure, CUNY was therefore "admitting to a retaliatory motive." *Id.* For several reasons, this argument is incorrect. To begin, the record contains substantial independent evidence that Dodd understood herself in 2017 to be pursuing early, not regular, tenure, making this argument academic at this step. *See, e.g.*, JSF ¶ 93. Second, Dodd's notion that CUNY, by citing the Agreement, admits a retaliatory motive does not logically follow. The *violation* of a settlement agreement accommodating a plaintiff's disability, and ensuing complaints, may indeed give rise to an inference of retaliation. *See, e.g.*, *Dodd*, 2018 WL 4284289, at *8 n.3. But Dodd has pointed to no authority that a defendant's *compliance* with a preceding such agreement itself is evidence of its retaliation. Indeed, there is ample authority to the contrary. *See, e.g.*, *Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009) (defendant in disability discrimination and retaliation suit articulated a "legitimate, nondiscriminatory, and nonretaliatory" reason for taking an adverse action against plaintiff: "to wit, the provision of the 1990 Settlement Agreement"); *see also Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1266–67 (10th Cir. 2007) (defendant's "interpretation and reliance on the terms of the Settlement Agreement does not itself violate Title VII and can serve as a legitimate, nondiscriminatory reason"); *Ruggieri v. Harrington*, 146 F. Supp. 2d 202, 220 (E.D.N.Y. 2001) (same).

Dodd is at liberty to argue, as she separately does, that the defendants misinterpreted or misapplied the Settlement Agreement—along with relevant CUNY procedures, and policies—in obliging Dodd's application to be treated as one for early tenure, or by imposing an inappropriately heightened standard to her application. But that argument goes to whether CUNY's stated bases for evaluating Dodd as an early-tenure applicant, and its denial of her application, were pretextual. It does not bear on the sufficiency of CUNY's evidence that it had

legitimate reasons for these actions. *See, e.g.*, *Jencks*, 479 F.3d at 1267. At this stage of the analysis, a reasonable jury could find CUNY's compliance with the Settlement Agreement to qualify as a legitimate and non-retaliatory reason for treating Dodd's application as one for early tenure.

Accordingly, the Court finds that CUNY has met its burden of articulating legitimate and non-retaliatory reasons for its denial of Dodd's tenure application.

*c.*        *Pretext*

The parties' principal debate is at this step. CUNY argues that the evidence Dodd has adduced would not allow a reasonable jury to conclude that the legitimate reasons it gave for denying her tenure application were pretextual. Def. Mem. at 9–15.

In so arguing, CUNY focuses tightly on the ultimate end-stage decision not to award Dodd tenure, *i.e.*, the views critical of Dodd's qualifications expressed during, and the circumstances surrounding, the committee meetings and votes held in late 2017 and early 2018, as well as earlier assessments of Dodd's qualifications expressing similar views. *See id.* As Dodd rightly notes, however, that is not the only available frame of reference. A finder of fact, in assessing Dodd's argument that CUNY's stated justifications were pretextual, could instead permissibly consider the longer saga of Dodd's interactions with CUNY and its officials. On CUNY's motion for summary judgment, the Court must consider the evidence in this fuller perspective. On such a motion, a "district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves*, 530 U.S. at 150); *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("As a jury would be entitled to review the evidence as a whole, courts must not view the evidence in piecemeal fashion in determining whether there is a trial-worthy issue.").

46

Accordingly, in assessing Dodd's theory of pretext, the Court considers all evidence adduced in discovery, not merely the evidence of the tenure review process leading to the 2017 and 2018 votes on Dodd's tenure application.

As reflected above, the evidence supports that, as of the start of the tenure-review process in 2017, Dodd had had a longstanding antagonistic relationship with officials at CUNY. A central event in this relationship had been the 2016 Settlement Agreement that resolved—as of then—her claims of disability discrimination.[5] Dodd had frequently sought accommodations for her disability, and had made formal claims of disability discrimination and retaliation within CUNY in January 2015, March 2015, and November 2015. *See* Pl. 56.1 ¶¶ 388, 399, 471; JSF ¶ 75. After CCNY's dean of diversity found in June 2015 that Cronin had discriminated against Dodd on the basis of her disability by refusing her an accommodation and that Boudreau had retaliated against her, *see* Baptiste Report at 9, and after Dodd retained counsel and lodged additional complaints against Cronin, Boudreau, Menon, and Occhiogrosso, *see* Pl. 56.1 ¶ 438; JSF ¶ 75, the conflict came to a head in 2016. In June 2016—to resolve both Dodd's complaints and to accommodate her disability—the parties entered into the heavily negotiated Settlement Agreement. Pl. 56.1 ¶¶ 497–498.

---

[5] CUNY argues that Dodd's release of legal claims in the Settlement Agreement precludes her from bringing claims as to defendants' pre-Agreement conduct. Dodd does not appear to disagree. And CUNY is clearly correct as to this point. *See, e.g.*, *Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 143 (E.D.N.Y. 2015). However, as CUNY appears to concede, *see* Def. Reply at 3, that release does not preclude Dodd from drawing on pre-Agreement events as evidence bearing on her claims of post-Agreement violations of law, including to support her theory that CUNY officials had longstanding antagonism to Dodd as a result of the claims she had made against them for failing to accommodate her disability. *See Kaytor*, 609 F.3d at 545. Nor does it prevent CUNY from relying on the similarly longstanding, documentary evidence of departmental concerns regarding Dodd's scholarship.

The evidence reflects, however, that the antagonistic relationship between Dodd and CUNY persisted.  Not long after the Agreement had been signed, Dodd claimed breaches of it.[6] *See, e.g.*, Pl. 56.1 ¶¶ 519–521, 544–548.  Within a year, she had brought another discrimination proceeding against CUNY officials evaluating her work, as well as a union grievance arising from the same events.  Pl. 56.1 ¶¶ 625, 628.  Notably too, under the Agreement, fall 2017 was the first time after the Agreement went into effect that the defendants had the opportunity to take formal action against Dodd in the tenure and reappointment processes.  *See* Settlement Agreement § 2 (stipulating to Dodd's reappointment through the 2017–2018 academic year).  For these reasons, although the period of relevant events in this case is more extended than in many employment discrimination cases, *see, e.g.*, *Feliciano*, 2015 WL 4393163, at *10, a fair evaluation of Dodd's theory of retaliation requires a farsighted, not myopic, assessment of those events.

Fairly stated, Dodd's history at CUNY reflects two recurrent themes.  One, emphasized by CUNY, involved the persistent, and contemporaneously documented, evaluations by a wide array of Dodd's supervisors and peers that criticized the quantity of Dodd's published scholarship.  The other, emphasized by Dodd, is her frequent press within CUNY for accommodations of her MS, including, but not limited to, as to the university's expectations for the volume and pace of

---

[6] As the Court held in denying CUNY's motion to dismiss, insofar as the Settlement Agreement resolved Dodd's earlier complaints of a failure to accommodate her disability, a reasonable jury could find Dodd's claims of breaches of that Agreement to be protected activity.  "Under these circumstances, when CUNY and CCNY received complaints from Dodd that the Settlement Agreement terms were being breached, they, at a minimum, 'reasonably [could] have understood that [Dodd] was complaining' about conduct prohibited by disability discrimination laws." *Dodd*, 2018 WL 4284289, at *8 n.3 (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).

her scholarly writings.  These ultimately manifested in Dodd's lodging of formal complaints against supervisory officials and, ultimately, this lawsuit.

On CUNY's motion for summary judgment, a central issue is whether these narrative threads can be treated, as CUNY urges, as separate and distinct, such that CUNY's eventual denial of tenure to Dodd was not caused by any impulse to retaliate against Dodd for her self-advocacy relating to her disability.  Dodd contends not, noting other cases involving allegedly discriminatory or retaliatory academic-promotion decisions regarding scholars who had brought claims of discrimination in which a defense summary judgment was denied.  *See, e.g.,* Pl. Opp'n at 12–13 n.6 (collecting cases); *see also Hinton*, 2008 WL 591802, at *7 (the "inference that [an] extensive and well-known history of discrimination complaints irritated her senior colleagues," along with other direct evidence, supported denial of summary judgment in academic promotion case); *cf. Hagan v. City of New York*, 39 F. Supp. 3d 481, 501 (S.D.N.Y. 2014) (remarking, on a motion to dismiss, that "[t]aken as a whole, these allegations suggest that Hagan was retaliated against because she . . . became a thorn in the side of officials who wanted to persist in unlawful discriminatory practices.").

Viewing the evidence as a whole and in the light most favorable to Dodd, as the non-movant, and resolving all factual ambiguities and drawing all "permissible factual inferences" in her favor, *Johnson*, 680 F.3d at 236, the Court holds, with Dodd, that—although there are ample grounds on which a reasonable jury could find for CUNY—there is also sufficient evidence on which such a jury could find that CUNY's denial of her tenure application was retaliatory.  In particular, the Court has identified five episodes or areas of conduct by CUNY officials towards Dodd which, taken together, can reasonably be read to support the inference Dodd urges of retaliation.  The Court reviews these below, and then considers CUNY's counterarguments.

i.      Krinsky's actions

Krinsky was appointed Political Science Department chair, in lieu of Cronin, for the limited purpose of conducting Dodd's tenure application.  Def. 56.1 ¶ 168.  Aspects of his conduct in that role—although susceptible to a benign interpretation—can be viewed as reflecting hostility to Dodd and supportive of pretext.

First, Dodd has adduced evidence of irregular and procedurally questionable actions by Krinsky in summer 2017, in connection with the tenure process.  Despite previously agreeing that Dodd would have until the end of July to compile and send her materials to potential referees, Krinsky, on June 10, 2017, less than a week after Dodd had lodged her latest discrimination complaint against Tartter, abruptly informed her that he would give her only until the end of the next week to complete these materials.  *See* Clark Decl., Ex. 271 at 3.  When Dodd responded seeking additional time, consistent with their agreement, Krinsky told her that if she failed to "consent to send out the relevant materials for your case" by "the end of this coming week," he would "take it as an indication that you wish to withdraw yourself from the Early Tenure process this year."  *Id.* at 2.  As a result of the accelerated timeline, Dodd was unable to update her candidate statement.  Pl. 56.1 ¶ 643.  Krinsky's stated justification for this about-face was his realization of a "fundamental conflict" between the timeline suggested by the 2012 Tenure Guidelines, which authorized the late July solicitations, and a separate memorandum from the Provost's office, which he stated did not.  Clark Decl., Ex. 271 at 2.  However, the cited memorandum does not necessarily give rise to such a conflict.  *See* Clark Decl., Ex. 279 at 4.  As Driscoll later testified, the dates provided in that memorandum are merely "suggested dates" and the relevant actions "may not occur on precisely these dates."  Pl. 56.1 ¶ 640.  Nor does Krinsky's explanation account for his decision to resolve the perceived conflict in a manner adverse to, rather than accommodating, the schedule that Dodd had been promised.  Evidence of

"weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" can support an inference of pretext. *Zann Kwan*, 737 F.3d at 845. Krinsky's abrupt and arguably inadequately explained acceleration of Dodd's schedule to complete her tenure materials for referees qualifies as such evidence.

Also in June 2017, Krinsky made changes to the Political Science Department's sample solicitation letter (which was used to seek external evaluations from referees) and to Dodd's CV, which appear to have been unique to Dodd's application. As to the former, he added language to the Department's sample letter emphasizing the "exceptional" and "extraordinary" nature of early tenure, and the requirement that a "very substantial reason" support such a grant. *Id.* ¶ 652. He also removed language stating that "[i]n Professor Dodd's case, early tenure may be warranted because of her outstanding scholarship." *Id.* ¶ 653; Clark Decl., Ex. 291. Although such changes, in isolation, would not give rise to an inference of animosity, Dodd has adduced evidence that, for the next early-tenure application the Department considered, in 2019, it did not retain either of these modifications. *Id.* ¶ 654.[7] CUNY has not adduced a clear explanation why

---

[7] CUNY argues, in its 377-page reply to Dodd's Rule 56.1 counter-statement, that the Court should disregard this later application because it falls "outside the range of comparator discovery ordered by the Court," even though CUNY produced the document. Def. Reply 56.1 ¶ 654; *see* Clark Decl., Ex. 292. The order CUNY cites, however merely orders the production of certain documents that were subject to a discovery dispute. *See* Dkt. 30 ¶ 4. It says nothing about the scope of the inferences Dodd may posit on summary judgment from the discovery that was produced. That said, CUNY is correct that—aside from the procedural inconsistency in the handling of Dodd's application relative to the 2019 application discussed herein—Dodd's attempt to compare her tenure application to those of other CUNY tenure candidates does not assist her cause. As CUNY notes, comparisons between academic departments are largely unhelpful, and often inappropriate. *See, e.g.*, *Zahorik*, 729 F.2d at 93; *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 324 (E.D.N.Y. 2014) (discussing First Amendment concerns with using comparator evidence in the academic context). And the 2019 early-tenure application in the Political Science Department to which Dodd adverts occurred several years after her application, and involved a candidate whose application package was demonstrably stronger than

these changes were, apparently, uniquely warranted for Dodd's early-tenure application. *See* Def. Mem. at 28–31; Def. Reply at 19–20 (discussing Krinsky's actions, but not the changes to the solicitation letter); *see Zann Kwan*, 737 F.3d at 845.

Further, several referees who responded to Krinsky's solicitation letter specifically cited the amended language in explaining their decisions whether to recommend tenure. *See, e.g.*, Clark Decl., Ex. 373 at 1 ("After carefully reviewing the material you sent me including the CCNY's standards for early tenure and your departmental criteria, I do not believe she meets the requirements for early tenure but appears to be on the cusp of satisfying the department's normal standards."); *id.*, Ex. 311 at 1 ("As this is a case of 'early' promotion under your university's rules, I will use the standard defined in your letter to me[.]"); *id.*, Ex. 314 at 1 ("I note particularly the high standard set for this case, as it is an early consideration.").

As to the change made to Dodd's CV, Krinsky informed her that she could not list her forthcoming sole-authored book as a "book" until it had been accepted for publication. Pl. 56.1 ¶ 594. Dodd acquiesced, and Krinsky changed her CV to list that book as a work "forthcoming or under review." Krinsky Decl., Ex. F at 2–3. As a result, her CV did not list any "books" at any point during her tenure review process. *See* Pl. 56.1 ¶¶ 181, 656. Again, when viewed alone, Krinsky's action in modifying Dodd's CV is not indicative of retaliatory animus. But again, in 2019, the next applicant to come up for early tenure in the Political Science Department was, unlike Dodd, permitted to list on his CV one "forthcoming" book and one book identified as "under contract, manuscript in preparation," each as "books." Clark Decl., Ex. 293 at 2. And, as with the solicitation letter, at least some referees noted that this aspect of Dodd's application

---

Dodd's. *See* Clark Decl., Ex. 293 at 2 (showing candidate's 15 peer-reviewed journal articles and a published sole-authored book).

gave them pause.  *See, e.g.*, Clark Decl., Ex. 313 ("When I first looked at Dodd's c.v., I saw that she does not yet have a book of her own.  . . . But the closer I looked at her writing, the less important that became.").  Evidence of "[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Zahorik*, 729 F.2d at 93; *see also Yongsheng Chen v. Penn. State Univ.*, No. 15 Civ. 01136, 2018 WL 2766607, at *4–5 (M.D. Pa. June 8, 2018) (finding pretext partially based on differential treatment of tenure dossiers).  Dodd can fairly so argue here.

As chair for purposes of Dodd's tenure process, Krinsky also drafted the Chair's Report explaining the Tenure Committee's decision not to recommend Dodd for tenure.  Def. 56.1 ¶¶ 183–188.  Much of the Chair's Report focuses on CUNY's proffered reasons for denying Dodd's tenure application—*i.e.*, shortcomings in her scholarship.  *See id.*  But the report also assesses her qualities as a "colleague."  Chair's Report at 4.  Specifically, Krinsky there cites past conflict stemming from Dodd's involvement in the Skadden Program, Dodd's "stubbornly taking the time of her colleagues" through the early-tenure process, and Dodd's failure to attend Department meetings as evidence that she was "an *exceptionally* difficult colleague." *Id.* at 4 (emphasis in original).  To be sure, the Report's criticism does not mention Dodd's many (and then-recent) complaints of disability discrimination and retaliation.  It therefore is not overt evidence of retaliatory animus.  *See, e.g.*, *Rueda v. City of New York*, No. 11 Civ. 5248 (VSB), 2017 WL 4221081, at *9 (S.D.N.Y. Sept. 21, 2017).  But context matters.  Viewed alongside Krinsky's actions recounted above, Dodd's history of claiming discrimination by her colleagues, and the antagonism between her and the Department at the time arising from the various breaches she had claimed of the Settlement Agreement, a reasonable jury could view these locutions regarding Dodd's "exceptional difficulty" as a colleague also to bespeak animosity

arising from her discrimination complaints, and hence to infer that the resulting tenure denial was influenced by retaliatory animus. *See, e.g.*, *Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 1051 (GBD) (KHP) 2020 WL 1528101, at *9 (S.D.N.Y. Mar. 31, 2020) ("A reasonable juror could view this comment as management considering Plaintiff to be a troublemaker because of his discrimination complaints.").

ii.    Divergent assessments of Dodd's scholarship

As a further evidentiary basis for inferring retaliation, the widely divergent assessments of Dodd's qualification for early tenure, both within and outside CUNY, create an issue of fact as to whether the non-retaliatory rationale CUNY has given for its denial of tenure was genuine or pretextual. *See, e.g.*, *Hinton*, 2008 WL 591802, at *27 (divergent assessments of plaintiff's reappointment applications created fact issue precluding summary judgment on retaliation claims); *Yongsheng Chen*, 2018 WL 2766607, at *4–5 (citing "diametrically opposed reviews given by different levels of reviewers" in support of denial of summary judgment on tenure claim). Here, even after the Tenure Committee's two negative screening votes and after reviewing the Chair's Report that was critical of Dodd, the P&B Committee, comprising four academic chairs within the Powell School, unanimously voted to grant Dodd tenure, although that decision was later reversed by the Review Committee. *See* Def. 56.1 ¶ 216. A finder of fact could certainly hold with CUNY that Dodd's scholarship was substandard for a tenure applicant. However, that a venerable committee within the tenure-review process reached the opposite conclusion weakens CUNY's position that Dodd's scholarship was so clearly substandard as to preclude a reasonable jury from disbelieving that its stated justification was the actual basis for the tenure denial.

The positive reviews from Dodd's external referees similarly could support as reasonable a jury's finding that CUNY's denial of Dodd's tenure application was motivated by retaliation,

54

as opposed to a consensus that her scholarship was unworthy. *See* Pl. 56.1 ¶ 712; *see, e.g.*, *Hinton*, 2008 WL 591802, at *15 (evidence that external reviews were "extremely good from very well-known scholars in the field" supported denial of summary judgment regarding academic promotion). Dodd's external reviewers were almost uniformly positive. Most were enthusiastic. One described Dodd's application as presenting an "easy, compelling case" that "clearly meets and exceeds the heightened standard set for early tenure at your institution." Clark Decl., Ex. 311 at 3. Another reviewer described her as "one of the leading young voices in public law" and a "master of constitutional torts and political movements," adding that the reviewer "already consider[ed] her a tenured member of the field." *Id.*, Ex. 312 at 4. Yet another predicted that Dodd's research "will establish her as one of the emerging voices" in her field, and that her scholarship "seems a recipe for a long and distinguished academic career." *Id.*, Ex. 310 at 3. A fourth stated that, in light of "both the quantity and quality of [Dodd's] work" and the reviewer's expectation that "her star will continue to rise," "[t]here is no doubt in my mind that she deserves tenure." *Id.*, Ex. 313 at 1, 3; *see also id.*, Ex. 314 at 6 ("I warmly and unequivocally recommend her for tenure and for promotion to the rank of Associate Professor."). Two referees' reviews were more mixed, although one concluded that, "[o]n balance, however, my assessment of the file is positive," *id.*, Ex. 315 at 2, and, as mentioned above, the only letter to recommend *against* granting Dodd's application remarked that Dodd's application was "on the cusp" of meeting CCNY's "normal standards" for tenure but more clearly fell short of the heightened standard for early tenure, *see id.*, Ex. 373 at 1.[8]

---

[8] CUNY contends that such assessments are "immaterial, particularly given that the parties have stipulated that Plaintiff's application was an application for early tenure—not regular tenure." Def. Reply 56.1 ¶ 672 (emphasis omitted). But given the language Krinsky added to Dodd's solicitation letter, and several evaluations' express contemplation of the early-tenure standard

### iii.    Boudreau's role

A reasonable jury could also conclude that Boudreau's continued involvement in the decision-making regarding Dodd's employment, and eventual decision to deny her tenure, was irregular and supports the inference that retaliation was a but-for cause of that denial.  *See Whaley*, 555 Supp. 2d at 407 (membership of a supervisor with retaliatory history on a faculty review committee reviewing plaintiff's reappointment supported denial of summary judgment on retaliation claim).  Dodd had, on multiple occasions, and in formal and informal complaints, accused Boudreau of disability discrimination and retaliation against her.  In 2015, an internal report by CCNY's dean of diversity explicitly found that Boudreau had retaliated against Dodd for protected activities related to her disability.  *See* Pl. 56.1 ¶ 422.[9]  Around the same time, Boudreau went so far as to excise favorable coverage of Dodd's courses from an alumni magazine.  *See id.* ¶¶ 469–470.  And in November 2015, before the parties entered into the Settlement Agreement, Boudreau himself recognized that "when and if [Dodd's] case comes to the review committee . . . I need also to recuse myself, since I was found to have retaliated against Lynda."  Pl. 56.1 ¶ 459; *see also id.* ¶ 521 (Driscoll testified that it was her "understanding that [Boudreau] was not going to be involved in decisions relative to any matters concerning Lynda Dodd" because "he thought he couldn't be" (alteration in original)).

---

cited therein, *see, e.g.*, Clark Decl., Exs. 311, 373, it is clear that these referees specifically reviewed Dodd's application as one for early, not regular, tenure.

[9] The Court does not consider the report's findings for the truth of the matters asserted therein. However, that the Baptiste Report found Boudreau to have retaliated against Dodd—which Boudreau appears to have remarked upon not infrequently, *see, e.g.*, Pl. 56.1 ¶ 441 ("As someone who has already been found to have retaliated against her, I'm asking for guidance on how to proceed); *id.* ¶ 459 ("I need also to recuse myself, since I was found to have retaliated against Lynda.")—is relevant evidence.  A jury could infer Boudreau, if anything, had a heightened motivation to retaliate against Dodd after being called out for retaliation in the Baptiste Report. *See, e.g.*, *Whaley*, 555 F. Supp. 3d at 405 (treating academic supervisor's comments noting that plaintiff had called him a "racist" as evidence supporting denial of summary judgment).

Notwithstanding his and others' recognition of the need for his recusal, Boudreau continued to intervene in Dodd's employment at CUNY.  This included his consulting with Driscoll regarding Dodd's complaints about violations of the Settlement Agreement—a situation Boudreau described as a "real mess."  *See, e.g.*, *id.* ¶ 520.  And in 2018, at the first opportunity he had to review Dodd's employment through the reappointment- or tenure-review process after the Agreement and the events precipitating it, Boudreau remained involved in and denied both applications.  *See id.* ¶¶ 221, 238.

To be sure, as CUNY notes, Boudreau's pre-Agreement conduct cannot itself form the basis for liability in this case given the Settlement Agreement.  *See* Def. Mem. at 2–3.  But the fraught history between Boudreau and Dodd is relevant evidence that a jury can consider in assessing the basis for Boudreau's later actions, including his intervention in her tenure review, in 2017 and 2018.  *See Whaley*, 555 Supp. 2d at 407; *see also Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 508–09 (D.C. Cir. 2005) (even indirect participation by potentially biased supervisor was grounds to reverse grant of summary judgment for employer on discrimination claims).  And, given that history, a jury could fairly infer that Boudreau remained involved in Dodd's tenure review process to get even with her for her successful earlier claim against him of unlawful retaliation.  This aspect of the Dodd tenure narrative—Boudreau's

about-face on his plan to recuse himself from that process—further supports Dodd's claim against CUNY and the denial of its motion for summary judgment.[10]

iv.    The early tenure standard

Fourth, Dodd—albeit just barely—raises a triable issue of material fact regarding the proper standard for her tenure application. *See Whaley*, 555 Supp. 2d at 407 (citing fact that "CUNY used the wrong, 'stricter' standard when deciding whether to reappoint [plaintiff]" to hold that the Court was "constrained to send the issue of retaliation to trial"). There is no genuine dispute that Dodd's application was appropriately considered one for early, not regular, tenure. As noted, Dodd expressly waived, through the Settlement Agreement, "any claim to tenure based upon [her] reappointment for and service during the 2016–2017 and 2017–2018 academic years." *Id.* As a result, in fall 2017, Dodd was considered to be in her fifth year of service at CUNY, two years short of the requisite seven years for regular-tenure consideration.

There is, however, a genuine dispute as to whether the early-tenure standard is in fact substantively more demanding than the regular one—*i.e.*, that it requires more or higher quality

---

[10] Dodd argues that yet another piece of evidence regarding Boudreau evinces pretext: a version of the 2012 Tenure Guidelines, sent from Cronin to Occhiogrosso on April 8, 2017, which included heightened standards for what the Department considers "scholarly achievement worthy of tenure." *See* Pl. Opp'n at 16. *Compare* 2012 Tenure Guidelines at 3 (listing 3–4 peer-reviewed journal articles), *with* Pl. Ex. 214 at 3 (listing 4–5 peer-reviewed journal articles). Although there does not appear to be evidence that this document was considered in, or in any way affected, Dodd's reappointment or tenure votes, Dodd argues that it nevertheless evinces pretext because the metadata for the document indicates that it was last edited by "vincent," whom she contends is likely Vincent Boudreau, and was done soon after she announced her intention to seek early tenure. *See* Pl. Opp'n at 16. That, however, is conjecture. And Cronin has averred, without refutation, that the operating system on his home computer was assigned the name "vincent" because he had received the computer from his neighbor, also named Vincent, and that he sent this document to Occhiogrosso from home on a Saturday, roughly four minutes after it was last saved. *See* Cronin Reply Decl. ¶¶ 5–13. Because a jury could associate this document with Boudreau only through speculation, this evidence does not bolster Dodd's claim of pretext. *See Bickerstaff*, 196 F.3d at 448.

58

scholarship than would be required of a regular-tenure applicant. Dodd argues that it is not.[11]
She contends that early tenure, while admittedly "exceptional," is only so because it is
uncommon for faculty to meet the substantive standards for regular tenure before their seventh
year of service. *See* Pl. Opp'n at 13; Pl. 56.1 ¶ 279; *see also* Clark Decl., Ex. 227 (email from
Dodd contesting propriety of heightened standard for early tenure in May 2017). Therefore, she
argues, it was procedurally unfair—and indicative of animus towards her—for CUNY to use and
articulate to evaluators a heightened standard associated with early tenure, and CUNY's doing so
supports an inference of pretext. *See* Pl. Opp'n at 13. CUNY counters that ample evidence in
the summary judgment record supports that applicants for early tenure must clear a substantively
higher bar than those for regular tenure. *See supra* pp. 7–8, 41–42 (reviewing evidence as to
applicable standard).

Much of the evidence available on summary judgment supports CUNY's position. As
CUNY notes, most of the documents on which Dodd relies do not in fact support her theory that
the early- and regular-tenure standards are coterminous. For example, CUNY's Statement of the
Board cautions that early tenure should be reserved for circumstances when "some *extraordinary
reason* indicates that the college would be well served by the early grant of tenure." Statement
of the Board at 9 (emphasis added); *see also* Joint Ex. 6 ("CCNY Policies on Reappointment,
Tenure, and Promotion") at 5 (also requiring "extraordinary reason"). Similarly, the CUNY

---

[11] Dodd devotes one sentence to this proposition in her opposition, and cites to 10 paragraphs in
her Local Rule 56.1 counter-statement in support. *See* Pl. Opp'n at 13. Those paragraphs span
four pages in her counter-statement—which is itself, at more than 500 paragraphs and 100 pages,
hardly "a short and concise statement"—and contain a bevy of arguments, assertions, and factual
statements regarding the proper standard for early tenure. *See* Pl. 56.1 ¶¶ 271–280. To the large
extent that these paragraphs consist of legal argument and conclusory statements rather than
factual statements, those "are disregarded in determining whether there are genuine issues of
material fact." *Alliance Sec. Prods., Inc. v. Fleming Co.*, 471 F. Supp. 2d 452, 454 & n.8
(S.D.N.Y. 2007) (collecting cases).

Bylaws authorize early tenure when "for a very substantial reason the college would be well served by such early grant of tenure." CUNY Bylaws § 6.2(c)(2). None of these policies speak in terms of timing, or merely describe early tenure as rare. Rather, they articulate the expectations associated with the tenure application itself: The *reason* for granting tenure at an early stage must be "extraordinary" or "very substantial." And several deponents testified that they understood the early-tenure standard to be substantively heightened. *See, e.g.*, Menon Tr. at 223 ("has to be an extraordinary case"); Lawson Decl., Ex. D ("Krinsky Tr.") at 222 ("you want to see evidence of something exceptional"); *id.*, Ex. E ("Driscoll Tr.") at 164 (early tenure requires "a level of accomplishment that is considered to be extraordinary," and "is not simply meeting the . . . criteria for tenure sooner than the end of seven years"); *id.*, Ex. F ("Foster Tr.") at 46 ("exceptional cases is the key phrase"); Kandel Decl., Ex. C ("Coico Tr.") at 20 (scholarship must be "above and beyond outstanding"). Dodd has not come forward with any evidence that the testimony on this point reflected other than these witness's good-faith understandings of the governing standards.

In response, Dodd first points to interpretations of the early-tenure standard articulated by two administrators within the CUNY system, which she argues accord with her view. A 2005 memorandum from then-CUNY-Chancellor James B. Milliken described three situations where early tenure would be appropriate, including "when for a very substantial reason the college would be well served by such early grant of tenure." Clark Decl., Ex. 6 ("Milliken Memo") at 1. Further explaining such circumstances, the Milliken Memo stated:

> One example of this would be the situation of faculty who have taught at another college and begun to establish a substantial record of scholarship before coming to one of our colleges. In the event we are successful in extending the tenure clock from five to seven years, I expect that this ground for early tenure consideration may become increasingly applicable.

*Id.*  This, Dodd argues, implies that timing, not substance, is what makes early tenure exceptional.  And the fact that she had in fact served at CUNY for seven years—and for seven more years before that at American University and Miami University in Ohio, *see* August 2017 CV at 10—places her, she argues, in the category of professors for whom early tenure might be warranted simply as a matter of longer service in academia.  Moreover, in 2013, the Chancellor of Queens College (a different college within CUNY) wrote a memorandum on early tenure, in which he stated that it is reserved for candidates who have "met the very high standard applicable to all tenure cases on an accelerated basis.  That is to say, the candidate has demonstrated all the accomplishments required for the grant of tenure at an accelerated rate and also demonstrates the requisite trajectory and long-term productivity."  Clark Decl., Ex. 8 at 1.

Dodd also highlights Professor Menon's testimony in this case.  Although Menon at one point repeated the "extraordinary" language quoted above, at another point in his deposition he stated that he "was not aware of" variations in the "substantive standards" between early and regular tenure.  Menon Tr. at 65.

Last, Dodd points out that although the 2012 Tenure Guidelines and CCNY Policies on Reappointment, Tenure, and Promotion contain "criteria" for general tenure appointments—including the volume of scholarship that would normally be expected of a successful tenure applicant—neither identifies distinct alternative criteria for early tenure.  *See, e.g.*, 2012 Tenure Guidelines at 1; CCNY Policies on Reappointment, Tenure, and Promotion at 4.  Thus, she argues, a jury could reasonably infer that, even in early tenure applications, the same "criteria"—and, thus, the "substantive standard"—apply as to regular tenure applications.

In light of these textual cues, drawn from internal CUNY writings spanning some 15 years, Dodd claims there is at least ambiguity as to the proper standard for early tenure, that

CUNY improperly imposed a higher bar on her application than was warranted, and that its adoption of a heightened standard in her cases supports an inference of pretext. *See* Pl. Opp'n at 13. CUNY, on the other hand, contends that Dodd's scant materials on this point are dwarfed by the voluminous evidence to the contrary that it has adduced, and that a heightened standard for early tenure was properly applied in Dodd's case. *See* Def. Reply at 6.

The Court's role, at the summary judgment stage, is not to weigh evidence. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 249). Even when a plaintiff's evidence is "far from overwhelming," perhaps "barely sufficient, in view of the extremely strong evidence put forth by defendants," *Whaley*, 555 F. Supp. at 407, the Court's role is only to determine whether "there is a genuine issue for trial," *Kessler*, 461 F.2d at 206 (quoting *Anderson*, 477 U.S. at 249). Here, there is. Viewed in the context of the entire summary judgment record, the Court finds that there is a genuine dispute as to whether Dodd's early application for tenure should have been assessed according to the regular criteria for tenure. A juror finding that CUNY selectively imposed a heightened standard in Dodd's case could infer that this, too, bespoke animosity towards her—and hence that the stated basis for the resulting tenure denial was pretextual.

> v. Common timing of tenure and reappointment votes

Finally, that the Review Committee denied Dodd both tenure and reappointment at the same February 7, 2018 meeting provides additional evidence from which a reasonable jury could make a finding of retaliation. *See* JSF ¶ 117. As discussed in more detail below, the Court finds CUNY's justifications for denying Dodd's reappointment to be substantially weaker than its reasons for denying her tenure. Both the Department *and* the P&B Committee recommended her reappointment (by substantial margins), and there is no claim that any heightened standard applied to her reappointment consideration. Thus, much of CUNY's strongest evidence of

legitimate reasons to deny Dodd tenure is absent in the context of the reappointment vote.  And, as reviewed below, there is additional evidence calling into question CUNY's stated reasons for declining to reappoint Dodd.

To the extent a jury might find that retaliation influenced the Review Committee's vote to deny Dodd reappointment, it could also find that such improper animus cannot be cabined to the reappointment context.  After all, the same group of decision-makers, on the same day, in the same meeting, made both decisions involving the same candidate based on, essentially, the same evidence.  Put differently, a jury that found the denial of reappointment to Dodd to have been an act of retaliation could find similarly motivated the contemporaneous decision to deny her tenure.

Viewing the above categories of evidence as a whole, the Court finds that Dodd has adduced sufficient evidence to allow a rational trier of fact to conclude that her denial of tenure was the result of retaliatory animus.  That is all that is required of a plaintiff at the summary judgment stage.  *See Kessler*, 461 F.3d at 206.  Accordingly, summary judgment is not warranted on Dodd's claim of a retaliation based upon the denial of tenure of her tenure application.

### vi.    CUNY's arguments

Before turning to Dodd's remaining claims, the Court addresses CUNY's remaining arguments in favor of summary judgment.

CUNY first cautions that ruling for Dodd would make this Court as a "super tenure committee."  *See, e.g.*, Def. Mem. at 9 (quoting *Blum v. Schlegel*, 150 F.R.D. 38, 41 (W.D.N.Y. 1993)).  But, as discussed above, universities and their tenure committees are not exempt from the Rehabilitation Act.  *Zahorik*, 729 F.2d at 93.  Insofar as the evidence Dodd has adduced raises genuine questions of material fact regarding whether her denial of tenure was animated by a desire to retaliate against her, nothing in the Rehabilitation Act requires this Court to abstain merely because CUNY is an academic institution.  Here, given Dodd's particular

history with CUNY and the years of bad blood between CUNY and her, in which her protected

claims of discrimination and retaliation played a central role, the Court finds that Dodd has

identified such questions.  And the nature of the retaliation inquiry here would inject the finder

of fact only secondarily in an assessment of the merits of her tenure bid.  Her claim instead will

predominantly rise or fall on lay evidence, and rational inferences therefrom, as to the

motivations of the participants in the tenure review process.

Second, CUNY argues that procedural irregularities are not relevant evidence within the

*McDonnell Douglas* framework.  *See, e.g.*, Def. Mem. at 13 ("As a matter of law, Plaintiff's

'disagreement with how [CUNY] applied its tenure criteria is insufficient evidence of pretext.'"

(quoting *Baldwin v. New York State*, 690 F. App'x 694, 698 (2d Cir. 2017) (summary order)));

Def. Reply at 7.  It is correct that, standing alone, procedural irregularities may not suffice to

establish pretext.  In *Baldwin*, for example, where the record was otherwise bereft of evidence of

a retaliatory motive, the district court held evidence that "the college never provided [plaintiff]

with a clear requirement for published scholarship, and if it did, she met that requirement,"

insufficient to create a triable issue of fact as to whether retaliation was the but-for cause of the

denial.  *Baldwin*, 690 F. App'x at 698.

However, the Second Circuit has long identified a defendant institution's failures to

comport with its own policies as prototypical pretext evidence within the *McDonnell Douglas*

analysis.  *See, e.g.*, *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) ("The

pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason

for the challenged action comports with the defendant's policies and rules, whether the rule

applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory

purpose was stated only after the allegation of discrimination.").  And, particularly relevant here,

in tenure and reappointment cases, the Circuit has found evidence such as "departures from procedural regularity" to be some of the *only* "available methods of challenging such decisions." *Zahorik*, 729 F.2d at 93; *Whaley*, 555 F. Supp. 2d at 407.  Here, from the evidence adduced by Dodd, a jury could find a large array of procedural irregularities following Dodd's many claims of discrimination and/or retaliation—many of which occurred suggestively in time relative to (1) those claims; (2) the Settlement Agreement; and (3) the Baptiste Report's validation of some of Dodd's grievances.  This case is thus a far cry from the paradigmatic mine-run cases in which modest procedural foot-faults alone have been held insufficient to support an inference of pretext.

Third, and relatedly, CUNY argues that the procedural failings to which Dodd points are minor in comparison with what it depicts as gaping deficiencies in her scholarship.  It argues that, considering these together, a reasonable jury could not find retaliation to have been the but-for cause of her tenure denial.  *See, e.g.*, Def. Mem. at 11; Def. Reply at 12.  Similarly, CUNY also contends that the long record of internal critiques of Dodd's scholarship—many of which precede by years the denial of tenure, and some of which precede Dodd's first disability discrimination complaint—validate that its tenure denial was genuinely based on the conclusion that her scholarship was deficient.  Def. Mem. at 11; Def. Reply at 4.

The former arguments are properly directed to a jury.  Had Dodd elicited scant evidence from which to infer retaliation, the Court would have charter to find that no reasonable jury could treat the tenure denial as motivated by retaliation.  But Dodd has adduced more, as reviewed above, and the Court may not arrogate to itself the jury's role in determining whether actionably improper motives drove that decision.  *See Kaytor*, 609 F.3d at 545; *Hicks*, 593 F.3d at 170.

As to the strength of CUNY's evidence of its legitimate motivations, CUNY has a point. In retaliation cases, a defendant's case is bolstered where the legitimate justifications it

articulates have long been documented and precede the employee's protected activity. *See, e.g.*, *Ya-Chen Chen*, 805 F.3d at 70; *Weinstock*, 224 F.3d at 45. Here, CUNY has mustered formidable, largely documentary, proof that Dodd's supervisors and peers found both the pace and quantity of her scholarship wanting from her early days at the university. *See supra* pp. 41–46; *see also* Dodd Tr. at 123 (identifying only one peer-reviewed article she published during her entire tenure at CUNY). For this reason, and particularly in light of the "but-for" standard that Dodd must meet to prevail on her Rehabilitation Act claim, the Court views CUNY's motion for summary judgment directed to Dodd's claim of a retaliatory tenure denial as presenting a close question. And a jury may well be persuaded of CUNY's position. Nonetheless, provided the plaintiff has adduced sufficient evidence supporting its thesis of retaliation, it is for the jury to review the conflicting evidence and resolve such a claim, even where defendants have put forward "extremely strong evidence" supporting their narrative. *Whaley*, 555 F. Supp. 2d at 407. Here, Dodd has adduced sufficient such evidence, and the events following her "extensive and well-known history of discrimination complaints" would permit a jury to find for her. *Hinton*, 2008 WL 591802, at *7. In the end, a jury may credit all, some, or none of Dodd's arguments based on the evidence, but that is "left for the jury to decide at trial." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 227 (2d Cir. 2014) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 21 (2d Cir. 2012)).

The Court accordingly denies CUNY's motion for summary judgment on Dodd's Rehabilitation Act retaliation claim as it relates to the denial of her tenure application.

### 3.     Denial of Reappointment

Summary judgment is also unwarranted for CUNY on Dodd's Rehabilitation Act claim as it relates to the denial of her reappointment. Dodd argues that soon after she threatened to sue, and then did sue, CUNY in October and December 2017, the Review Committee, in a decision

again confirmed by Boudreau, retaliated in February 2018 by denying her reappointment.  Pl.

Opp'n at 10–11.  As with her claim arising from the denial of tenure, Dodd emphasizes that the

decision on reappointment presented the Review Committee and Boudreau with their first

opportunity to act against her after the 2016 Settlement Agreement and the events leading up to

it.  *Id.* at 11, 23.  On this point, CUNY does not contest Dodd's *prima facie* case.  It argues only

that it has put forward sufficient legitimate, non-retaliatory reasons for its decision, which Dodd

cannot show are pretextual.

      For the following reasons, the Court disagrees with that assessment, viewing the question

of pretext as for the jury.

      As in the context of the denial of tenure, CUNY has articulated legitimate and non-

retaliatory reasons for denying Dodd's reappointment.  It has adduced evidence that at least three

people who voted to reject Dodd's application for reappointment—one on the Executive

Committee, one on the Review Committee, and Boudreau—viewed her scholarship as

unsatisfactory.  *See* Def. Mem. at 16.  And, as discussed, "deficient scholarship is a legitimate,

non-[retaliatory] reason to deny reappointment and/or tenure."  *Whaley*, 555 F. Supp. 2d at 406

(collecting cases).

      However, the evidence of CUNY's legitimate justification for denying reappointment is

palpably weaker than the evidence of such justification in connection with the denial of tenure.

In justifying the denial of tenure, CUNY leans heavily on the demanding quality of the early-

tenure standard.  But that standard does not apply to the reappointment decision.  Dodd's 2018–2019

reappointment was, under the Settlement Agreement, considered her fifth reappointment.  *See*

Settlement Agreement § 2.  Unlike in the early-tenure context, CUNY has not identified

evidence of any heightened expectations for a reappointment candidate at that stage.  *See* Def.

Mem. at 16.  Rather, the evidence suggests that the primary consideration during reappointment reviews is a professor's "progress towards standards of tenure."  Foster Tr. at 32.  However strong the evidence is that Dodd fell short of the early-tenure standard in 2017, Dodd can point to substantial evidence that, when she was denied reappointment for 2018–2019, she was either on track or close to on track for a tenure-track candidate of her vintage.  *See, e.g.*, Krinsky Tr. at 232 ("Would I have—might I have voted for tenure, straight tenure, not early tenure, I might have.");  Clark Decl., Exs. 310–315 (referee letters); Chair's Report at 2 ("Dodd's publication record is, as one evaluator noted, close to our standards for the department.").  Thus, the core justification for the tenure denial is absent in the context of Dodd's non-reappointment.  That weakens, relative to CUNY's defense of the tenure decision, its defense that it had a legitimate justification for denying reappointment.

On the other side of the ledger, Dodd's evidence that the reasons for denying reappointment were pretextual—covering up for animosity towards her arising from her protected claims against CUNY—is, if anything, stronger than her evidence with respect to the contemporaneous tenure denial.

First, both the Department's Executive Committee and the P&B Committee recommended that Dodd be reappointed for the 2018–2019 academic year.  *See* JSF ¶¶ 104, 107.  Unlike in the tenure context, in which the P&B Committee alone voted to grant Dodd tenure, here it was only at the Review Committee level, followed by Boudreau's denial of her appeal, that Dodd's reappointment foundered.  *Id.* ¶¶ 104, 107, 120.  As noted, such divergent assessments may permit a jury to find an inference of pretext.  *See, e.g.*, *Hinton*, 2008 WL 591802, at *27; *Yongsheng Chen*, 2018 WL 2766607, at *4–5.

Second, that Boudreau remained the ultimate decision-maker on Dodd's reappointment is problematic for CUNY on this claim, much as it was in the tenure-denial context. *See supra* pp. 56–58; *see also Whaley*, 555 F. Supp. 2d at 407. The record makes clear that Dodd and Boudreau had been at odds for years. It supports the inference that Dodd's persistent agitation for accommodations, including complaints against Boudreau personally, was a source of enmity. Boudreau's continued involvement in the reappointment process, in light of this history, could allow a reasonable jury to conclude that Dodd's termination was the result of retaliatory animus on his part rather than the legitimate reasons CUNY proffers. *See Salazar*, 401 F.3d at 509; *Whaley*, 555 F. Supp. 2d at 407.

Third, the timing of Dodd's reappointment denial could support the inference that it arose from retaliatory, not benign, motives. *Whaley*, 555 F. Supp. 2d at 406. Dodd's 2018–2019 reappointment was the first on which Boudreau or the Review Committee had an opportunity to vote after her 2015 complaints against Boudreau (and others), the findings of the Baptiste Report, the 2016 Settlement Agreement, Dodd's ensuing complaints about violations of the Agreement, and her threat to bring the instant lawsuit.

Taken together, these facts, viewed in the context of the full summary record and viewed in the light most favorable to Dodd, give rise to genuine questions of material fact regarding CUNY's motivations in declining to reappoint Dodd. By many accounts, Dodd was a leading scholar in her field at the time of the 2017 reappointment vote. *See, e.g.*, Clark Decl., Ex. 312 (describing Dodd as "one of the leading young voices in public law" and a "master of constitutional torts and political movements"). Both her department and the chairs of the other departments within the Powell School had voted in favor of reappointment. JSF ¶¶ 104, 107. The latter had further supported her for tenure. *Id.* ¶ 113. In contrast to the substantial

documentation showing that CUNY had sound performance-based reasons, arising from the slow pace of her scholarship, to deny Dodd early tenure, CUNY has identified limited evidence why, in her fifth year of service, Dodd no longer merited university employment.  Primarily, this evidence consists of Boudreau's Statement of Reasons for denying Dodd's appeal.  *See* Def. 56.1 ¶¶ 238–243.  But, as discussed, the timing and circumstances of that decision by Boudreau would allow a jury to discount his reasons as pretextual.  That decision came after Dodd had made years of discrimination complaints against him, had filed her first Complaint in this lawsuit, and at CUNY's first opportunity to end her employment after her various internal complaints, the resulting Settlement Agreement, and her ensuing claims of breaches of that Agreement.

The Court accordingly holds that the evidence would permit a reasonable jury to find that CUNY's reasons not to reappoint Dodd as an associate professor were pretextual, and that CUNY's desire to retaliate against her for protected activity was a but-for cause of that decision.

### 4.     Other Allegedly Retaliatory Actions

Before turning to Dodd's ADA and state-law claims, the Court briefly addresses CUNY's motion for summary judgment on the Rehabilitation Act claim against it with respect to a number of subsidiary incidents and decisions.  These are:  (1) Tartter's 2016 evaluation of Dodd; (2) Occhiogrosso's actions with respect to Dodd's union grievance against Tartter; (3) CUNY's decision to eliminate the Flom Professorship; (4) CUNY's denial of back pay connected to Dodd's Flom Professorship; (5) Boudreau's failure to recuse himself from Dodd's tenure and reappointment decisions, and Occhiogrosso's decision not to recuse himself from resolving Dodd's union grievance; (6) Krinsky's conduct with respect to Dodd's tenure application; and (7) Cronin's involvement in Dodd's employment, including his decision to prevent her from teaching at the Graduate Center.  CUNY argues that none of these actions supports an independent claim for retaliation under the Rehabilitation Act.  *See* Def. Mem. at 17–37.

The Court denies this aspect of the motion as moot.  Although Dodd's briefing is less than pellucid on this point, the Court has not, at any point, understood her to plead, or pursue, the claim that these individual incidents or decisions, standing alone, give rise to a freestanding claim for relief under the Rehabilitation Act.  *See, e.g.*, Pl. Opp'n at 24.  Dodd's Rehabilitation Act claim centers on the decisions denying her tenure and reappointment, each of which she claims is actionable under the Act.  As for the incidents and decisions preceding these decisions, Dodd's theory is that the jury may consider them as evidence in determining whether CUNY's denials of tenure and reappointment were retaliatory.  The Court's decision denying defendants' motion to dismiss analyzed Dodd's claims consistent with this understanding.  *See Dodd*, 2018 WL 4284289, at *7–8.  The Court accordingly has no occasion to address whether a freestanding Rehabilitation Act claim based on any of the above acts could have be actionable.

## B.        Dodd's Retaliation Claim Against Boudreau Under the ADA

Defendants next move for summary judgment on Dodd's ADA claim against Boudreau in his official capacity.  Because the ADA and Rehabilitation Act, as relevant to the instant motion, are identical, the Court applies the standards discussed above to this claim.  *See Treglia*, 313 F.3d at 719 (Rehabilitation Act claims are "governed in this respect by the same standards as the ADA").  Thus, Dodd must first make out a *prima facie* case of discrimination as to Boudreau.  *Treglia*, 313 F.3d at 719.  If she does, the burden shifts to Boudreau to articulate a legitimate, non-retaliatory reason for his decisions.  *Id.* at 721.  Finally, the burden shifts back to Dodd to show that such reasons are merely pretext for unlawful retaliation.  *Id.*

At the threshold, Boudreau argues that Dodd's ADA claim fails "as a matter of law" because "President Boudreau has no unilateral authority to" perform the injunctive relief she requests in her second amended complaint.  *See* Def. Mem. at 37.  But Boudreau does not cite any evidence that, as CUNY President, he would be powerless to implement court-ordered relief,

nor any case law dismissing claims on similar grounds.  The Court therefore denies Boudreau's motion for summary judgment on this ground.

As to the merits of the claim, the parties' arguments essentially reprise those made on Dodd's Rehabilitation Act claim against CUNY, with respect to both the denials of tenure and reappointment.  *See* Def. Mem. at 38 ("As demonstrated above, there is no evidence that these reasons were pretextual, and there is certainly no evidence that President Boudreau denied Plaintiff's appeals because of some prior protected activity." (emphasis omitted)); Pl. Opp'n at 38 ("As set forth above, there is ample evidence to find that Boudreau had retaliatory motives and to call into doubt his explanations for his actions.").

Accordingly, substantially for the reasons set out above, the Court denies summary judgment as to Dodd's ADA claim against Boudreau.  Dodd's retaliation allegations indeed appear to have particular traction as against Boudreau.  Dodd had previously brought disability discrimination and/or retaliation complaints against Boudreau, one of which resulted in a finding that he did retaliate against her, and the other of which led to the Settlement Agreement.  *See* Pl. 56.1 ¶¶ 399, 408–409, 471.  Boudreau also, as noted, reneged on his plan to recuse himself from Dodd's tenure decision and had described her case as "a real mess."  *Id.* ¶ 520.  And, at the first opportunity he had to terminate Dodd's employment and deny her tenure bid, he did so.  *Id.* ¶¶ 221, 238.  As to Dodd's reappointment, he overruled the favorable votes of both the Political Science Department and the P&B Committee of the Powell School.  *See* Def. 56.1 ¶¶ 222–226. A reasonable jury could find that Boudreau acted against Dodd as to both tenure and reappointment denials out of a desire to retaliate against her for protected claims of disability discrimination and retaliation, made against CUNY and Boudreau personally.

The Court therefore denies summary judgment on Dodd's ADA claim against Boudreau.

**C.**   **Dodd's Retaliation Claims Against the Individual Defendants Under the NYSHRL and NYCHRL**

Defendants next move for summary judgment as to Dodd's state- and city-law claims against the individual defendants.

        **1.**   **Applicable Legal Standards**

                *a.*   *NYSHRL*

Retaliation claims under the Rehabilitation Act, ADA, and NYSHRL are governed by the same standards.  *Treglia*, 313 F.3d at 719; *see Weinstock*, 224 F.3d at 42 n.1; *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012); *see also* 29 U.S.C. § 794(d); N.Y. Exec. Law § 296(7).  Unlike the Rehabilitation Act, however, the NYSHRL allows for individual liability either where an individual defendant is considered an "employer," N.Y. Exec. Law § 296(1)(e), or where the defendant aided and abetted the unlawful discriminatory acts of an employer, *id.* § 296(6).

An individual defendant is liable as an employer under § 296(1) "when that individual has an ownership interest in the relevant organization or the power to do 'more than carry out personnel decisions made by others,'" *i.e.*, the power to hire or fire.  *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984) (per curiam)).

The NYSHRL's aiding and abetting provision makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).  "[T]his language allow[s] a co-worker who '*actually participates* in the conduct giving rise to a [retaliation] claim' to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (emphasis added) (quoting *Tomka v.*

*Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)).   Courts may find personal liability "for aiding

and abetting allegedly unlawful [retaliation] by [an] employer even where [an individual

defendant's] actions serve as the predicate for the employer's vicarious liability," so long as the

employer's conduct has also been found discriminatory under the NYSHRL.  *Farmer v. Shake*

*Shack Enters., LLC*, No. 19 Civ. 9425 (PAE), 2020 WL 4194860, at *16 (S.D.N.Y. July 21, 2020)

(citation omitted).[12]  However, "[a]iding and abetting liability requires that the aider and abettor

share the intent or purpose of the principal actor, and there can be no partnership in an act where

there is no community of purpose."  *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR),

2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011*) (quoting *Brice v. Sec. Operations Sys., Inc.*,

No. 00 Civ. 2438 (GEL), 2001 WL 185136, at *4 (S.D.N.Y. Feb. 26, 2001)).  Thus, to support such

liability, Dodd must show "direct, purposeful participation" by the individual defendants.  *Id.*

      *b.*     NYCHRL

Unlike state-law claims, claims under the NYCHRL are not treated identically to their

federal counterparts and must be analyzed independently.  *See Ya-Chen Chen*, 805 F.3d at 75–76

(discussing *See* N.Y.C. Admin. Code § 8-107(7)).  First, the NYCHRL's definition of retaliation

is broader than that in the Rehabilitation Act and NYSHRL.   "Rather than requiring a plaintiff to

show an adverse employment action, [the NYCHRL] only requires [her] to show that something

happened that was reasonably likely to deter a person from engaging in protected activity."

*Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *8 (S.D.N.Y.

Jan. 16, 2020) (alterations in original) (quoting *Malena*, 886 F. Supp. 2d at 62).  Second, the

NYCHRL does not require a plaintiff to show but-for causation.  Instead, "summary judgment is

---

[12] Although courts in this District have recognized this logic as "perhaps circular," it remains the law in this Circuit.  *Boyce v. Weber*, No. 19 Civ. 3825 (JMF), 2020 WL 5209526, at *2 n.3 (S.D.N.Y. Sept. 1, 2020) (discussing *Tomka*, 66 F.3d at 1317).

appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 (2d Cir. 2013). Otherwise, a claim for retaliation "faces the same requirements under the NYCHRL as under the NYSHRL," *Malena*, 886 F. Supp. 2d at 362, including in its provision of a cause of action against aiders and abettors of unlawful retaliation.  N.Y.C. Admin. Code § 8-107(6).

The Court considers Dodd's claims against each individual defendant in turn.

### 2. Boudreau

A reasonable jury, as the Court has previously held, could find that Boudreau was Dodd's employer for purposes of the NYSHRL and NYCHRL.  *See Dodd*, 2018 WL 4284289, at *9. Accordingly, the same analysis applies to Boudreau under both the ADA and the NYSHRL.  *See Treglia*, 313 F.3d at 719.  Having sustained Dodd's ADA claim against Boudreau, the Court similarly denies his motion for summary judgment as to the substantively parallel NYSHRL claim.  And as the NYCHRL's protections are broader than the NYSHRL's, the Court also denies Boudreau's motion for summary judgment on that claim.

### 3. Krinsky

The Court has reviewed above Krinsky's actions as chair in connection with Dodd's tenure application.  *See supra* pp. 50–54.  A reasonable jury could find these actions to constitute actual participation in conduct giving rise to Dodd's claim—to wit, the tenure denial.  And, for the reasons reviewed, a reasonable jury could also find that Krinsky acted with retaliatory animus towards Dodd in undertaking those actions.  The evidence thus supplies a factual basis on which Krinsky could be found liable under the NYSHRL and NYCHRL as an aider and abettor. The Court therefore denies Krinsky's motion for summary judgment on that claim.

### 4. Cronin

Although the question as to Cronin is close, Dodd's NYSHRL and NYCHRL aiding and abetting claims against Cronin are also supported by sufficient evidence to reach a jury.

Dodd has adduced evidence that could be found to constitute actual participation in the process leading to the tenure denial. In particular, there is evidence that Cronin denied her request to teach at the Graduate Center, a credential and experience which Dodd has credibly asserted stood to bolster her coming bid for tenure. *See* Pl. 56.1 ¶¶ 532, 537.

There is also a basis on which a reasonable jury could find Cronin's decision to deny Dodd this teaching opportunity to have been retaliatory. His intercession on this issue—taking the initiative to restrict her teaching schedule—could be found to have breached the Settlement Agreement's prohibition on his involvement with decisions concerning Dodd's teaching and personnel matters. *See* Settlement Agreement §§ 7–8; Pl. 56.1 ¶¶ 444, 449–450, 524. In fact, Cronin communicated his adverse decision to the Graduate Center within days of Dodd's complaining about his other alleged violations of the Settlement Agreement. Pl. 56.1 ¶ 535–536, 532, 545. And because the Settlement Agreement grew out of Dodd's protected claims of discrimination against CUNY and various officials, including Cronin himself, a jury could find Cronin's breaches of it to be retaliatory. *See, e.g.*, *Dodd*, 2018 WL 4284289, at *8 n.3. Cronin maintains that it was his general policy as chair not to release untenured faculty members to teach graduate courses. *See, e.g.*, Cronin Decl. ¶ 16. But the record does not reflect any explanation from him for why he took this action—consistent though it may have been with his past practice—given its apparent contravention of the Settlement Agreement's prohibition on his continued oversight of Dodd's employment.

The Court therefore denies Cronin's motion for summary judgment on these claims.

### 5.     Tartter

Summary judgment, however, is warranted as to Dodd's NYSHRL and NYCHRL claims against Tartter.  Dodd focuses on Tartter's unhelpful written evaluation of her.  But Dodd has not adduced any evidence on which a reasonable jury could find, other than by speculation, that Tartter's evaluation was retaliation for—or animated in any way by—protected activity of Dodd's.  Rather, Dodd's claims regarding Tartter dominantly are that Tartter was unfamiliar with Dodd's work and the Political Science Department's review processes, and that she consulted with Occhiogrosso while drafting her evaluation.  Whether or not Tartter was well-qualified to conduct that evaluation, however, does not evince retaliatory animus on her part.  Nor does evidence that Tartter consulted with CCNY's counsel, in light of the prior Settlement Agreement with Dodd and the possibility that Tartter's evaluation could prompt new discrimination and/or retaliation complaints, give rise to such an inference.  *See, e.g.*, Clark Decl., Ex. 211.  Dodd also accuses Tartter of being "hostile" or "nasty," but even crediting these broad generalizations, Dodd has not adduced evidence tracing such behavior to Dodd's protected activity.  *See Chawki v. N.Y.C. Bd. of Educ.*, 341 F. App'x 660, 662 (2d Cir. 2009) (summary order) (mere allegations of bias do not support finding of retaliatory animus).

Accordingly, no reasonable jury could conclude that Tartter herself participated in retaliation against Dodd or "share[d] the intent or purpose" of doing so.  *Fried*, 2011 WL 2119748, at *7.  Because, on this score, the NYCHRL's protections are coterminous with the NYSHRL's, summary judgment is warranted as to both claims against Tartter.  *See id.*; *see also Mihalik*, 715 F.3d at 116 (NYCHRL requires summary judgment where plaintiff "cannot show that retaliation played any part in the employer's decision").

### 6. Menon

Dodd's NYSHRL and NYCHRL claims against Menon are also unsupported by legally sufficient evidence.  Although Dodd previously filed a discrimination complaint against Menon, she does not point to any actual participation by Menon in conduct giving rise to a retaliation claim.  The most Dodd alleges is that Menon agreed to serve on her advisory committee despite Dodd's earlier complaint, that Menon briefly consulted with Krinsky regarding Dodd's tenure process, and that Menon failed to attend the 2018 Review Committee meeting at which Dodd's tenure and reappointment denials occurred.  Pl. Opp'n at 43.  No reasonable jury could find that these few acts constitute active participation in retaliation, let alone, other than by speculation, that Menon harbored retaliatory animus against Dodd.

Finding no evidence from which a reasonable jury could infer any retaliatory animus or active participation in CUNY's retaliation, the Court accordingly enters summary judgment on both Dodd's NYSHRL and NYCHRL claims against Menon.  *See Mihalik*, 715 F.3d at 116.

### 7. Driscoll

Dodd also fails to adduce sufficient evidence that Driscoll actively participated in conduct giving rise to retaliation or that she shared a "community of purpose" with any individual who did.  *Fried*, 2011 WL 2119748, at *7.  Dodd first contends that Driscoll's failure to ensure her 2016 evaluation occurred by October 31, 2016, and subsequent appointment of Tartter to conduct that evaluation, evince retaliatory animus.  But Dodd's 2016 evaluation is at some remove from the later tenure and reappointment denials, and Dodd does not point to any evidence that Driscoll's actions with regard to that evaluation derived from a retaliatory purpose. And, in any event, Driscoll has proffered legitimate reasons for those actions, which Dodd has not shown to be pretextual.  As to the delay in Dodd's evaluation, a jury could readily conclude that the confluence of Driscoll's increased workload and Professor Stein's terminal illness gave

rise to a legitimate reason that the evaluation was not completed by October 2016. *See* Def. 56.1 ¶¶ 135–145. And as to the selection of Tartter to conduct Dodd's review, there is simply no evidence in the record to support a jury's finding that retaliation for any protected activity motivated that choice.[13]

Dodd next argues that, even if Driscoll herself did not participate in retaliatory acts, she may still be liable because she "fail[ed] to remedy" violations of the Settlement Agreement. *See* Pl. Opp'n at 44. But that does not support liability under the NYSHRL or NYCHRL in this case. Contrary to Dodd's depiction, a principal case on which Dodd relies did *not* hold that the mere failure to remedy alleged violations constitutes a violation of either law. *See Feingold*, 366 F.3d at 157–58. Rather, it held that the defendants at issue "*not only* took no action to remedy such behavior although they were aware of it, *but also* terminated Feingold's employment on the basis of impermissible factors." *Id.* at 158 (emphasis added). And there is no evidence that Driscoll "intentionally or recklessly disregarded" Dodd's complaints. *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 384 (S.D.N.Y. 1999). On the contrary, the record shows that Driscoll made efforts to respond to Dodd's complaints and address her concerns, including approving her teaching at the Graduate Center. *See, e.g.*, Pl. 56.1 ¶¶ 548, 577.

Because a reasonable jury could not conclude, on the evidence adduced, that Driscoll actually participated in or aided and abetted in retaliation, or harbored retaliatory animus in the actions taken towards Dodd, the Court enters summary judgment for Driscoll on Dodd's

---

[13] Although Driscoll was incorrect in her understanding that Tartter had personally completed faculty evaluations before Dodd's, *see* Def. Mem. at 25 n.13, Dodd has not introduced evidence that this error was anything other than "a good faith mistake." *Brown v. N.Y.C. Dep't of Educ.*, 513 F. App'x 89, 91 (2d Cir. 2013) (summary order). And Tartter, as a former acting dean, did in fact have experience with reviewing and presenting evaluations more generally, and seeing faculty through the tenure process. *See* Lawson Decl., Ex. K ("Tartter Tr.") at 68–69.

NYSHRL claims.  And in the absence of any evidence of retaliatory motives, Dodd's claims, even under the broader NYCHRL, are also supported by insufficient evidence to reach a jury.

### 8. Foster

Dodd argues that a jury could find that Foster participated in retaliation against her because he (1) "was a part of" the delay of her graduate teaching; (2) participated in selecting Tartter to conduct Dodd's 2016 review; (3) advised Tartter during the review process; (4) "participated in" the decision to shorten Dodd's timeline for submitting her tenure materials; and (5) advocated against her tenure and reappointment at the February 7, 2018 Review Committee meeting, and then voted against her on both counts.  *See* Pl. Mem. at 42.  None of these incidents, even taken together, would permit a rational jury to find that Foster harbored any retaliatory animus against Dodd.

As to the graduate teaching, no reasonable jury could find that Foster's "delay" bore any indicia of retaliation.  On the day he was asked to assist with the process, Dodd wrote to him stating that "it appears that it is too late to add the Grad Center course," leading him not to act immediately on her prior request.  Def. 56.1 ¶¶ 122, 125.  And he and Driscoll approved her graduate teaching by April 2017.  Pl. 56.1 ¶ 577.  Nor, as discussed above regarding Driscoll, could a reasonable jury find the selection of Tartter to conduct Dodd's 2016 evaluation retaliatory, and there is no evidence that any advice Foster gave to Tartter during this process was adverse to Dodd (let alone retaliatory).  *See* Pl. Mem. at 42.

As to Dodd's timeline for submitting her tenure materials, she cites only an email in which Krinsky told Dodd that, according to Foster, the common practice was to give referees more time with tenure packets than her preferred schedule would allow.  *See* Pl. Opp'n at 42; Clark Decl., Ex. 335.  This does not support a finding that Foster was an active participant in any decision with respect to Dodd's tenure application, or acted with any retaliatory animus.

Dodd's most substantial basis for pursuing liability against Foster is that Foster was tasked with presenting on Dodd's tenure and reappointment at the decisive February 7, 2018 Review Committee meeting.  *See* Pl. 56.1 ¶ 717.  In that respect, Foster could be found to have participated in actions adverse to her employment.  Dodd's evidence that Foster participated in this meeting with "the intent or purpose" of retaliating against Dodd for her protected activity, however, comes up short.  Dodd points only to (1) the contrast between Foster's negative views on Dodd's scholarship, which Foster represents without refutation were the basis of his votes against tenure and reappointment, *see* Def. Mem. at 43 n.23, and those of other scholars in her field;[14] and (2) the fact that, at a later point, Boudreau appointed Foster to a new associate dean post at CCNY.  *See* Pl. Mem. at 42; Pl. 56.1 ¶¶ 754–755.  On this record, a jury could only find that Foster retaliated against Dodd, in order to curry favor with Boudreau and obtain a new job, by engaging in speculation.  *See Bickerstaff*, 196 F.3d at 448 ("This undertaking is not one of guesswork or theorization.").  Accordingly, summary judgment is appropriate on Dodd's state- and city-law claims against Foster.  Even measured against the NYCHRL's broad protections, this claim is impermissibly speculative.  *See Gioia v. Forbes Media LLC*, 501 F. App'x 52, 56 (2d Cir. 2012) (summary order) (affirming summary judgment on NYCHRL retaliation claim where "[s]hort of speculation, there is no evidence that" discrimination "played even a partial motivating role in the decision to terminate" plaintiff); *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 802 (S.D.N.Y. 2020) (same and collecting cases).

---

[14] Dodd also contrasts her record of scholarship with what she characterizes as Foster's "own anemic scholarship record."  Pl. Opp'n at 42.  The Court does not perceive any relation between Foster's own scholarship and his motivations with respect to Dodd's tenure and reappointment denials.

### 9.      Occhiogrosso

Dodd argues that Occhiogrosso engaged in retaliation against Dodd when he delayed resolving the first step of Dodd's union grievance against Tartter.  But no reasonable jury could so find.  The evidence does not support either that this delay was connected to the denials of tenure and reappointment on which Dodd's claim turns, or that Occhiogrosso's inaction resulted from retaliatory animus.  Further, to the extent Dodd faults Occhiogrosso for his edits to Tartter's evaluation, that cannot be a basis for liability either, because the evidence does not support that Tartter's evaluation was retaliatory, or that Occhiogrosso's involvement with it was undertaken with retaliatory intent.  *See, e.g.*, *Fried*, 2011 WL 2119748, at *7; Pl. 56.1 ¶¶ 581–583.

Dodd separately contends that Occhiogrosso may be held liable under the NYSHRL and NYCHRL because he was present during various decisions that CUNY officials made with respect to Dodd, "was coordinating with other defendants," and served as Boudreau's "go-to person."  Pl. Opp'n at 40.  She cites numerous instances during the tenure application process in which Occhiogrosso "consulted," *see* Pl. 56.1 ¶ 571, "exchange[d] . . . emails," *id.* ¶¶ 608, 610–611, 636, and advised others, including Krinsky and Boudreau, *id.* ¶ 651.  For example, Krinsky testified that although Occhiogrosso "did not tell me what do," he "advised on what he thought was the right course of action."  Def. Reply 56.1 ¶ 651.

That evidence, without more, is insufficient to support liability under either the NYSHRL or the NYCHRL.  Occhiogrosso was CUNY's in-house counsel and labor designee.  In those capacities, he was consulted on (and present for) decisions regarding Dodd, as is unsurprising given Dodd's history of claims against CUNY and its officials, and the consequent sensitivity of personnel decisions regarding her.  Dodd, however, has not adduced any evidence that Occhiogrosso engaged in "direct, purposeful participation" in any retaliatory act, that any statements evincing a retaliatory purpose were made in his presence, that he was otherwise aware

82

of others' retaliatory aims, or that he shared a "community of purpose" with any person as to whom the evidence could support liability.  The evidence instead supports that Occhiogrosso was present to carry out the responsibilities of in-house counsel, and did so.  *See, e.g.*, Clark Decl., Ex. 365 ("Occhiogrosso Tr.") at 222 ("I provided advice to Professor Tartter on how best to conduct the evaluation in the context of complying with a settlement agreement and in order to ensure, as best as possible, that the evaluation complied with contractual requirements, given that we anticipated litigation, if there was an adverse personnel action.").

On the summary judgment record, no reasonable jury could find that Occhiogrosso aided or abetted retaliation against Dodd.  Even under the more stringent NYCHRL standard, Dodd must still establish that retaliatory animus motivated Occhiogrosso's actions with respect to Dodd; and she has failed to do so here.  The Court accordingly grants the motion for summary judgment on both Dodd's state- and city-law claims against Occhiogrosso.

## CONCLUSION

For the reasons stated above, the Court grants defendants' motion for summary judgment as to Dodd's NYSHRL and NYCHRL claims against Tartter, Menon, Driscoll, Foster, and Occhiogrosso.  The Court otherwise denies the summary judgment motion.  The Clerk of Court is respectfully directed to terminate the motion pending at docket 97.

An order will issue shortly as to the scheduling of a jury trial and setting dates for the parties' pretrial submissions.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: September 25, 2020
New York, New York